**VILLAS WEST II OF WILLOWRIDGE, Homeowners Association, Inc., Appellant–Plaintiff/Cross–Defendant,**

v.

**Edna McGLOTHIN, Appellee–Defendant/Cross–Claimant.**

No. 34A02–0504–CV–370.

Court of Appeals of Indiana.

Jan. 30, 2006.

they are not considered "actually lost." Appellant's App. at 121.

Jeremy A. Peelle, McCann & Peelle, Kokomo, P. Thomas Murry, Jr., Eads Murray & Pugh, Indianapolis, for Appellant.

Joseph H. Davis, Hans S. Pate, Davis & Pate, Kokomo, for Appellee.

## OPINION

SHARPNACK, Judge.

Villas West II of Willowridge Homeowners' Association, Inc. ("Association") appeals the trial court's judgment in favor of Shirley Ashcraft, as personal representative of the estate of Edna McGlothin, deceased ("McGlothin").[1] The Association raises two issues, which we restate as:

I. Whether the trial court erred by denying the Association's motion for summary judgment where McGlothin admitted violating a restrictive covenant that prohibited leasing of a residence; and

II. Whether the trial court's judgment that the restrictive covenant against leasing violated the Fair Housing Act, 42 U.S.C. §§ 3601–3619, is clearly erroneous.

We affirm.

The relevant facts follow. In 1996, Algie and Edna McGlothin purchased a residence in Villas West II of Willowridge ("Villas West II") in Kokomo, Indiana. Residences in Villas West II are "duplex condo-style homes." Transcript at 161. The covenants for the Villas West II, which were recorded by Jim Bagley Construction Co., Inc. ("Jim Bagley Construction") in 1992, provide, in part:

"Dwelling" shall mean and refer to a single family residence erected on a Lot or a Cluster and shall be used by the owner or a contract purchaser, and his immediate family.

* * * * *

Lease of Dwelling By Owner. For the purpose of maintaining the congenial and residential character of Villas West II and for the protection of owners with regard to financially responsible residents, lease of a Dwelling by an Owner, shall not be allowed. Each Dwelling shall be occupied by an Owner and their immediate family.

Appellant's Appendix at 28, 43. Jim Bagley Construction controlled the homeowners' association until May 2000, when it turned control of the homeowners' association over to the homeowners.

In January 1998, Edna was placed in a nursing home, and Algie was placed in a nursing home about six months later.[2] On August 18, 1999, Ashcraft leased the residence to Sue Veach for a term of one year. Veach leased the residence until July 2002. In August 2002, Ashcraft leased the residence to Juna Brandenburg, and the term of that lease was extended to August 31, 2005.

---

1. Edna McGlothin died in December 2004, after the bench trial but before the trial court issued its order. Shirley Ashcraft, as personal representative of the estate of Edna McGloth-in, deceased, filed the appellee's brief on appeal.

2. Algie died in June 1999.

In August 2002, the Association notified Ashcraft that McGlothin was in violation of the covenants by leasing her residence. In October 2002, the Association filed a complaint for injunctive relief against McGlothin, alleging that McGlothin was violating the covenant against leasing a residence and requesting injunctive relief and attorney fees. McGlothin filed an answer, affirmative defense, and counterclaim. McGlothin admitted that she was renting the residence but denied that the covenant was valid and enforceable. McGlothin's affirmative defenses alleged that she was not informed of the covenant until August 2002, that she had rented the residence since August 1999, and that she would lose her Medicaid benefits if she was unable to lease the residence, and provided:

20. Under the facts of this case, it would shock the conscience of civilized Americans and cause irreparable damage to [McGlothin] for [the Association] to force [McGlothin] to evict her tenant, Juna Brandenburg, and thereby cause [McGlothin] to lose rental income and qualification for Medicaid benefits.

21. Under the facts, [the Association is] estopped to force [McGlothin] to evict her tenant and thereby incur liability for damages which would result from a wrongful breach of the lease agreement entered into between [McGlothin] and Juna Brandenburg.

22. Said Article IX, Section 4(b), is unconscionable and against public policy, and therefore, is unenforceable by [the Association] against [McGlothin].

Appellant's Appendix at 55. McGlothin's counterclaim alleged that the covenant against leasing "evidenced an intention to make a preference, limitation, or discrimination among persons who could occupy dwellings within the subdivision based on race, color, sex, familial status, or national origin" and that the covenant "has a discriminatory effect on the availability of housing within the subdivision in violation of the Fair Housing Act." *Id.* at 56.

The Association filed a motion for summary judgment and alleged that McGlothin's property was subject to the covenant, that McGlothin admitted violating the covenant, and that the Association was entitled to summary judgment. In support of its motion, the Association designated its complaint, McGlothin's answer, the amended declaration of covenants, conditions, and restrictions for Villas West II, and its brief in support of its motion for summary judgment. Thus, the Association designated evidence that demonstrated that McGlothin's property was subject to the covenant and that McGlothin admitted violating the covenant.

McGlothin responded to the Association's motion for summary judgment by arguing that the Association had failed to establish each factor entitling it to an injunction and that the Association lost the right to injunctive relief through "waiver, lashes [sic], or similar conduct." *Id.* at 76. Although she did not request summary judgment on her counterclaim regarding the Fair Housing Act, McGlothin also responded to the Association's motion for summary judgment by arguing that the covenant was discriminatory under the Fair Housing Act. After a hearing, the trial court denied the Association's motion for summary judgment and found that "at least two issues are present; whether or not the [Association] is barred by laches and whether or not the [Association's] covenant is discriminatory." *Id.* at 3.

The trial court then held a bench trial and entered the following findings of fact and conclusions thereon:

### FINDINGS OF FACT

The Court, having considered the evidence now finds:

1. Villas West II Planned Unit Development of Willowridge Subdivision was platted in April 1990, and developed by Jim Bagley Construction Co., Inc.

2. Villas West II is located in the City of Kokomo, Howard County, Indiana. The subdivision has 149 lots each of which contains a dwelling.

3. Jim Bagley Construction Co., Inc. published and caused to be filed in the Office of the Recorder of Howard County "An Amended Declaration of Covenants, Conditions and Restrictions for Villas West II Planned Unit Development, Willowridge Subdivision" recorded April 2, 1992, in Miscellaneous Record 80, page 0458, which contains the following provisions ("the covenants"):

 " 'Dwelling' shall mean and refer to a single family residence erected on a Lot or a Cluster and shall be used by the owner or a contract purchaser, and his immediate family."

 "*Lease of Dwelling by Owner.* For the purpose of maintaining the congenial and residential character of Villas West II and for the protection of the Owners with regard to financially responsible residents, lease of a Dwelling by an Owner, shall not be allowed. Each Dwelling shall be occupied by an Owner and their immediate family."

 ("the covenants")

4. That Article 9, Section 3 of the Declaration provides the Plaintiff with the right to seek injunctive relief for any violation of the restrictive covenants contained therein and damages arising from same.

5. [Algie] McGlothin and Edna McGlothin, husband and wife, by their daughter and attorney-in-fact, Shirley A. Ashcraft, purchased Lot Number 60A in Willowridge Subdivision, Section II, Villas West Two, for $88,000. They took title by Warranty Deed dated August 26, 1996. The Deed contains the following:

 "Subject to the 1996 taxes and assessments due and payable in 1997, and all taxes and assessments due thereafter and subject to any and all easements, agreements and restrictions of record."

6. [Algie] and Edna McGlothin moved into their dwelling in the Willowridge Community shortly after closing. Edna McGlothin lived in the home until 1998 when she broke her hip and was placed in the Windsor Estates Nursing Home. [Algie] McGlothin was cared for at his home for a period of five (5) months by persons who occupied the dwelling and were not members of his family. [Algie] McGlothin was placed in the nursing home in 1998 and remained there until his death on June 13, 1999.

7. By Lease dated August 18, 1999, Edna McGlothin's dwelling in Villas West II was rented to Sue Veach for a term of one (1) year. Sue Veach is not a member of the immediate family of Edna McGlothin. After the one (1) year term, Sue Veach continued to rent the McGlothin residence on a month-to-month basis until July, 2002.

8. Effective August 1, 2002, Edna McGlothin's dwelling in Villas West II was leased to Juna Brandenburg for a one (1) year term. The term of that lease has been extended to August 31,

2005. Juna Brandenburg is not a member of the immediate family of Edna McGlothin.

9. Edna McGlothin died on December 11, 2004. Edna McGlothin's home in Villas West II is rented to Juna Brandenburg for $550 per month. Of the $550 per month rent, $324.36 net income was paid to the nursing home each month. Edna McGlothin was maintained before her death in the nursing home on a monthly basis with rent of $324.26, Social Security of $1,159.00, [Algie] McGlothin's disabled veteran's pension of $1,208.00, Edna McGlothin's pensions of $7.50 and $24.76, and an annuity of $455.17. The Indiana Family and Social Services Administration ("Medicaid") made up the shortfall. Edna McGlothin's only assets are her home and a bank account with around $200.

10. Pursuant to 405 IAC 2–3–15–C(10) Edna McGlothin was entitled to own her home and receive Medicaid benefits so long as the rental income from her home is greater than the expenses of ownership. The Indiana Family of Social Services Administration ("Medicaid") has advanced $23,363.66 for the care of Edna McGlothin and has served Edna McGlothin with "Notice of Intent to File a Lien on Real Property and Opportunity for a Fair Hearing". If the agency determined that it could not be [sic] reasonably be expected that Edna McGlothin would be discharged from the nursing facility to return to her home, then that agency may place a lien on Edna McGlothin's dwelling to secure repayment of Medicaid payments made. The lien may be foreclosed upon Edna McGlothin's death, or if the property were sold prior to death.

11. Before suit was filed, Shirley Ashcraft, Edna McGlothin's daughter and attorney-in-fact, wrote two letters to Elaine Daulton, President of the Association, explaining Edna McGlothin's need to rent her dwelling. By letter dated August 20, 2002, Malinda Grant, Secretary–Treasurer of the Association gave written notice to Shirley Ashcraft that Edna McGlothin was violating the covenants. By letter dated August 28, 2002, Joseph H. Davis, attorney for Edna McGlothin, advised Malinda Grant that Edna McGlothin's dwelling was rented and that rent and Medicaid pay to maintain Edna McGlothin in the nursing home. The letter also cautioned Ms. Grant that the covenants probably had roots in racial discrimination.

12. By letter dated September 23, 2002, Jeremy A. Peelle, Attorney for the Association, advised Mr. Davis that the Association "is not unsympathetic to the situation involving Mrs. McGlothin, but the action she has taken in renting her premises in violation of the covenants is an unacceptable solution to her problem." Mr. Peelle state[d], "The association is concerned about its residents and the economic consequences the violation could have on the neighborhood and property values as a whole." With that letter Mr. Peelle enclosed a copy of the Complaint and stated that he would be seeking an injunction against the renting of the premises, any and all damages, the eviction of the current tenant, and attorney fees.

13. Villas West II is a part of the Willowridge Community. Jim Bagley Construction Co., Inc. advertises the Willowridge Community as "Restricted—your investment is protected here."

14. The word, "restricted," is defined by Webster's Third International Dic-

tionary (1993), as "limited to the use of a particular class of people or specifically excluding others (as members of a class or ethnic group felt to be inferior)(a residential area)(-hotels..." Other dictionary definitions include ["]... limited to white Christians," and "... limited to or admitting only members of a particular group or class, esp. white gentiles."

15. The covenants operate so as to remove housing units within Villas West II from the rental market.

16. There are occasions where dwellings in Villas West II have been occupied by persons who were not members of the immediate family of the owner or contract purchaser. In one situation the developer sold a unit to a Kentucky limited liability company known as Thomas and Chou Center for Physical Medicine and Rehabilitation, PLLC. The limited liability company could have no immediate family. In another instance Don Holihan, President of the Board of Directors of the Association, had knowledge that the dwelling next to his which was owned by the Ortmans was occupied for three or four months by Jim and Kathy Long. Jim and Kathy Long were home from Africa to attend their son's wedding. The Longs are not members of the immediate family of the Ortmans.

17. At the time when Edna McGlothin's dwelling was rented to Sue Veach, Jim Bagley Construction Co., Inc. was in control of and managed the Association. From August 1, 1999 to July, 2002, Edna McGlothin's unit was rented to Sue Veach. There is evidence that personnel at the Jim Bagley Construction Co., Inc. office knew the home was rented. The Association did not complain during that three (3) year period.

18. According to the U.S. Census Bureau 2000 Census the population of the City of Kokomo is 46,113. 39,242 of those are White alone and 6,023 are persons of races other than White. 4,770 are classified as African American alone. 2,080, or 44% of the African American population resides in Census Tract 2, which is a relatively small area located east and northeast of Kokomo's downtown business area. The area is designated by the City of Kokomo as a low-moderate income area. In that Census Block 370 units are renter occupied and 519 are owner occupied by African American householders.

19. Of the 149 lots in Villas West II, there are 147 dwellings owned by white persons and 2 dwellings owned by African Americans. The racial mix of Villas West II is 98.7% white to 1.3% African American. The racial mix of the City of Kokomo is 86.69% white to 10.54% African American and 2.77% other racial minorities.

20. In the City of Kokomo there are 1,925 housing units which are occupied by African American householders. 889 of those are occupied by householders who own units and 1,036 are occupied by householders who rent units. 1,036 [divided by] 1,925 = 54% of African American householders in the City of Kokomo rent their dwellings. The average household size of housing units occupied by African American householders is 2.4 persons. Doing the math, there are 1,036 × 2.4 = 2,486 persons who live in African American rented housing units.

21. The covenants which remove housing units within Villas West II from the rental market effectively exclude the 1,036 African American household-

ers who rent housing units from the subdivision. That is, 54% of all African American householders in Kokomo are excluded from the subdivision.

22. In the City of Kokomo there are 2,602 housing units which are occupied by racially minority householders. 1,156 of these are occupied by householders who own units and 1,446 of those are occupied by householders who rent units. 1,446 [divided by] 2,602 = 56% of all racially minority householders in Kokomo rent their dwellings.

23. The covenants which remove housing units in Villas West II from the rental market effectively exclude the 1,446 racially minority householders who rent housing units in the City of Kokomo from the subdivision.

24. There are 18,827 housing units which are owned or rented by White alone householders in the City of Kokomo. 6,431 are renter occupied. Therefore 6,431 [divided by] 18,827 = 34% of White alone householders are excluded from the subdivision by the covenants.

25. The covenants exclude 56% of racial minority householders from the subdivision, and only 34% White alone householders from the subdivision.

26. According to the testimony of Dr. Lauster, the models which he used showed that African American householders in Kokomo are far more likely to rent their homes than white householders. For example, comparing 30 year old persons with $40,000 per year income, an African American person has a 68% chance of renting a home as compared to a white person who has only a 34% chance of renting a home.

27. The covenants have a greater adverse effect on the African American and racial minority householders than on white householders.

28. The covenants limit interracial association between residents of Villas West II and householders of minority races to those householders of minority races who are able to buy homes in the subdivision, to the total exclusion of racial minority households who could rent homes in the subdivision if homes were available.

29. By the Association's evidence, 27% or 28% of African American households have income sufficient to rent homes in Villas West II if such homes were available for rent.

30. By excluding all renters from Villas West II, the Association excludes minority households who can afford to rent homes in the subdivision as well as those who cannot afford to rent homes in the subdivision.

31. The covenants along with similar covenants in other subdivisions have the effect of shifting the burden of the rental market and the attendant interracial association with minorities who live in rental houses to other neighborhoods.

32. The Association's reason for excluding renters from the subdivision is that renters do not maintain homes which they rent as well as owners maintain their homes. Therefore, the exclusion of renters helps maintain property values.

33. However, the Declaration of Covenants contains numerous provisions requiring proper maintenance; these include the following, which are included herein by reference:

Article V. Sections 1

Article V. Sections 2

Article V. Sections 2–A

Article IX. Sections 3(a)

Article IX. Sections 3(c)
Article IX. Section 3(d)
Article IX. Section 3(e)
Article IX. Section 3(f)
Article IX. Section 3(g)
Article IX. Section 3(i)
Article IX. Section 3(j)

The Plaintiff has, by these provisions, more than adequately assured a neat, clean and visually attractive environment, and a high degree of property maintenance. The Defendant would still be held to these requirements even while renting her home. Therefore, the Plaintiff's justification for the no-rent provision lacks a factual basis, and is mere subterfuge, rendering said provision unnecessary and useless.

34. There is no showing that the limiting of occupancy of dwellings within Villas West II to owners and members of their immediate families is a business necessity.

35. There is no business necessity that owners of dwellings within Villas West II be prohibited from renting or leasing their dwellings.

36. There is no business necessity that the class of person designated as "renters" be excluded from Villas West II.

37. The Court can find no legitimate non-discriminatory reason for limiting occupancy of dwellings within Villas West II to owners and members of their immediate families.

### CONCLUSIONS

The Court can find no legitimate reason for the inclusion of Article IX, Section 4(b) (the "no-rent" provision) in the Declaration of Covenants. While it cannot be conclusively determined that this provision was included to foster segregation, there can be no doubt that it has a serious discriminatory result.

Whether the builder of the tract realized it or not, the words "restricted," as used in its advertisements clearly sent a message to the African American community. Dr. Herbert Mitler, an African American professor at Indiana University–Kokomo, himself a victim of past discrimination, very eloquently and convincingly described how the word "restricted" is what the black community commonly knows to be a "code word" indicating that African Americans (and perhaps other minorities) are not welcome.

While the Plaintiff demonstrated that a few African Americans do own homes in Villas West II, thereby attempting to counter any discriminatory effect argument, such evidence was not persuasive. Thankfully, this country's laws are *now* such that it is virtually impossible to *manifestly* deny ownership of a home to a minority member or family. A no-rent provision accomplishes a similar goal, however, in a more subtle way.

Furthermore, the covenant, if enforced, would have harmed the Defendant had she survived these proceedings. She would have lost rent and her qualification for Medicaid unless she sold her home. Conversely, the Plaintiff suffers no conceivable harm by disallowing enforcement.

The statistics that the Defendant presented to the Court clearly prove that the restriction has a significantly greater negative impact on African American members of this community than it does on the Caucasian population.

The stated policy of the United States is to provide, within constitutional limitations, for fair housing throughout the United States. 42 U.S.C. 3601. It is not fair to deny 1,446 racially minority

householders who rent their homes, that is 56% of all racially minority householders, all opportunity to rent dwellings in Villas West II from owners in Villas West II who want to rent their dwellings. The purposes of the Association must give way to the policy of the United States.

Publication of the advertisement, "Restricted—your investment is protected here," and publication and enforcement of the covenants constitute discriminatory housing practices under 42 U.S.C. Section 3604. The Association's threat to sue Edna McGlothin if she did not evict her tenant and cease renting her dwelling, and the filing of its complaint for an injunction claiming attorney's fees and costs to which the Association was not then entitled, make Edna McGlothin an aggrieved person under 42 U.S.C. 3613.

As an aggrieved person, Edna McGlothin is entitled to recover under federal law from the Association her actual, nominal and punitive damages, and reasonable attorney's fee and costs.

### JUDGMENT

IT IS, THEREFORE, ORDERED, that the covenants be, and they are hereby declared void and of no force and effect. The Court enters Judgment for Defendant Edna McGlothin and against Plaintiff Villas West II of Willowridge Homeowners Association, Inc. on Edna McGlothin's Counterclaim for $1.00 nominal damages.

Appellant's Appendix at 10–21.

### I.

The first issue is whether the trial court erred by denying the Association's motion for summary judgment where McGlothin admitted violating a restrictive covenant that prohibited leasing of a residence. We first note that once final judgment has been entered following trial, the ultimate determination of the trier of fact upon the merits of the claim has taken place and the interlocutory nature of the denial of summary judgment terminates. *Keith v. Mendus*, 661 N.E.2d 26, 35 (Ind.Ct.App.1996), *trans. denied.* Thus, a party who fails to bring an interlocutory appeal from the denial of a motion for summary judgment may nevertheless pursue appellate review after the entry of final judgment. *Id.* "Such a denial does not irretrievably dispose of one or more issues between the parties; neither does it determine nor foreclose the rights of the parties." *Id.* "Rather, the denial of a motion for summary judgment merely places the parties' rights in abeyance pending ultimate determination by the trier of fact." *Id.* Consequently, although this case proceeded to trial and the trial court entered final judgment on McGlothin's claims, we may still review the trial court's ruling on the Association's motion for summary judgment. *See, e.g., Northern Indiana Public Service Co. v. Dabagia*, 721 N.E.2d 294, 298 (Ind.Ct.App.1999), *reh'g denied, trans. denied.*

When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it is for the trial court: we examine whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *City of North Vernon v. Jennings Northwest Regional Util.*, 829 N.E.2d 1, 3 (Ind.2005). "Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law." *Id.* We construe all evidence in favor of the opposing party, and we resolve all doubts

as to the existence of a material issue against the moving party. *Id.*

The Association requested summary judgment on its complaint against McGlothin but did not request summary judgment on McGlothin's counterclaim. In response, McGlothin argued, in part, that the Association's injunctive relief was barred due to laches. Moreover, although she did not request summary judgment on her counterclaim regarding the Fair Housing Act, McGlothin also responded to the Association's motion for summary judgment by arguing that the covenant was discriminatory under the Fair Housing Act. The trial court denied the Association's motion for summary judgment because it found that "at least two issues [were] present; whether or not the [Association] is barred by laches and whether or not the [Association's] covenant is discriminatory." Appellant's Appendix at 3.

■ On appeal, the Association argues that it was entitled to summary judgment and that the trial court erred by denying its motion for summary judgment on both grounds. "We will affirm the denial of summary judgment if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court." *Ford v. Culp Custom Homes, Inc.,* 731 N.E.2d 468, 472 (Ind.Ct.App.2000), *trans. denied.* Thus, we may affirm the trial court's denial of the Association's motion for summary judgment if it sustainable on either basis.

We conclude that the denial of the Association's motion for summary judgment if it is sustainable on the basis of laches. After the Association filed its motion for summary judgment, McGlothin responded by arguing, in part, that the Association lost the right to injunctive relief through "waiver, laches [sic], or similar conduct." Appellant's Appendix at 76. The trial court denied the Association's motion for

summary judgment, in part, because it found that genuine issues of material fact existed as to whether the Association's claim was barred by laches.

■ On appeal, the Association argues that the trial court erred by denying its motion for summary judgment based upon laches because McGlothin failed to plead this defense in her affirmative defenses. However, the Association did not present this argument to the trial court. It is well settled that arguments not presented to the trial court on summary judgment are waived on appeal. *King v. Ebrens,* 804 N.E.2d 821, 826 (Ind.Ct.App. 2004). The trial court "cannot be found to have erred as to an issue or argument that it never had an opportunity to consider." *GKC Indiana Theatres, Inc. v. Elk Retail Investors, LLC.,* 764 N.E.2d 647, 651 (Ind. Ct.App.2002). Thus, the Association has waived this argument. *See, e.g., King,* 804 N.E.2d at 826 (holding that a party waived its objections on appeal to an affidavit presented in support of a motion for summary judgment by failing to raise its objections to the trial court); *Mannon v. Howmet Transp. Serv., Inc.,* 641 N.E.2d 70, 73 n. 1 (Ind.Ct.App.1994) (holding that the party moving for summary judgment waived its argument that the opposing party's affidavit should not be considered because the moving party never objected to the timeliness of the affidavit to the trial court), *reh'g denied.* The Association makes no other argument demonstrating that the trial court erred by denying the motion for summary judgment on the basis of laches. Thus, we conclude that the Association failed to meet its burden of demonstrating that the trial court erred by denying its motion for summary judgment on the basis of laches. The Association also argues that the trial court erred by denying its motion for summary judgment on the basis of the discriminatory nature

of the covenant. However, we need not address this issue because the denial of the motion for summary judgment is sustainable on the basis of laches.

## II.

▮▮▮▮ The next issue is whether the trial court's judgment that the restrictive covenant against leasing violated the Fair Housing Act, 42 U.S.C. §§ 3601–3619, is clearly erroneous. The trial court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind.1999).

▮▮▮▮ The Association argues that the trial court's finding that the restrictive covenant is "void" is clearly erroneous. Appellant's Appendix at 21. The Association's complaint against McGlothin was based upon her violation of the restrictive covenant against leasing the residence.[3] In general, a restrictive covenant is a contract between a grantor and a grantee that restricts the grantee's use of land. *Holliday v. Crooked Creek Vill. Homeowners Ass'n, Inc.*, 759 N.E.2d 1088, 1092 (Ind.Ct. App.2001). "The general purpose of a restrictive covenant is to maintain or enhance the value of adjacent property by controlling the nature and use of surrounding properties." *Id.* Restrictive covenants are generally disfavored in the law and will be strictly construed by the courts, which resolve all doubts in favor of the free use of property and against restrictions. *Grandview Lot Owners Ass'n, Inc. v. Harmon*, 754 N.E.2d 554, 557 (Ind.Ct.App. 2001). "[T]he power of a court to issue a mandatory injunction as a means of enforcing restrictive covenants is well-established." *Depeyster v. Town of Santa Claus*, 729 N.E.2d 183, 190 (Ind.Ct.App. 2000).

▮▮▮▮ Nevertheless, restrictive covenants are a form of express contract recognized under the law. *Grandview*, 754 N.E.2d at 557. "[B]ecause of their contractual nature, restrictive covenants are enforced as long as the restrictions are unambiguous and do not violate public policy." *Holliday*, 759 N.E.2d at 1092. For

---

**3.** The developer testified that Villas West II contained "duplex condo-style homes," not "true condominium[s]." Transcript at 160–161. We note that condominiums are governed by Ind.Code §§ 32–25–1–1 to 32–25–9–2. Ind.Code § 32–25–9–1 provides that "[e]ach condominium unit owner shall comply with ... the covenants, conditions, and restrictions set forth in: (A) the declaration; or (B) the deed to the owner's condominium unit." I.C. § 32–25–9–1(a). The failure to comply with the covenants, conditions, and restrictions is grounds for an action: "(1) to recover sums due; (2) for damages; (3) for injunctive relief; or (4) for any other legal or equitable relief ...." I.C. § 32–25–9–1(b). The statutes do not specifically address whether restrictive covenants prohibiting the leasing of a condominium are valid.

example, restrictive covenants that restrict use of land based on race are unconstitutional, and racial restrictions contained in deeds are invalid. *Corner v. Mills*, 650 N.E.2d 712, 715 (Ind.Ct.App.1995) (citing *Shelley v. Kraemer*, 334 U.S. 1, 23, 68 S.Ct. 836, 847, 92 L.Ed. 1161 (1948)). Illegal restrictive covenants "may be removed if to do so will not affect the intent or symmetry of the remaining covenants." *Id.* (citing *Brokaw v. Brokaw*, 398 N.E.2d 1385, 1388 (Ind.Ct.App.1980)).

The Association cites numerous cases from other jurisdictions holding that restrictive covenants prohibiting leasing of condominiums are, in general, valid and enforceable. *See, e.g., Woodside Vill. Condo. Ass'n, Inc. v. Jahren*, 806 So.2d 452 (Fla.2002); *Apple II Condo. Ass'n v. Worth Bank & Trust Co.*, 277 Ill.App.3d 345, 213 Ill.Dec. 463, 659 N.E.2d 93 (1995). However, the trial court found that restrictive covenants prohibiting leasing violated the Fair Housing Act. Consequently, the issue on appeal is whether the trial court's finding that the restrictive covenant prohibiting leasing violated the Fair Housing Act and was unenforceable is clearly erroneous.[4] Neither party cites authority directly on point, and our research likewise reveals no relevant authority on this issue. *See generally* David E. Grassmick, *Minding the Neighbor's Business: Just How Far Can Condominium Owners' Associations Go In Deciding Who Can Move Into The Building*, 2002 U. ILL. L. REV. 185 (2002).

We begin by noting that resolution of this issue turns on the interpretation of a federal statute. The Indiana Supreme Court has held that "[a]lthough U.S. Supreme Court decisions pertaining to federal questions are binding on state courts, lower federal court decisions may be persuasive but have non-binding authority on state courts." *Indiana Dep't of Pub. Welfare v. Payne*, 622 N.E.2d 461, 468 (Ind. 1993) (citing *Pennsylvania R.R. Co. v. F.E. Mathias Lumber Co.*, 113 Ind.App. 133, 136, 47 N.E.2d 158, 159 (1943)), *reh'g denied.* In *F.E. Mathias Lumber*, the court held:

> "Where a question is federal in its nature, the decisions of the supreme court of the United States are absolutely binding on the various state courts and must be followed." 21 C.J.S., Courts, p. 365, § 206; 15 C.J., p. 930, § 318. While there is a conflict as to whether the decisions of the lower federal courts are binding on state courts, the weight of authority is, that while such decisions have a persuasive authority, they are not binding on the state courts. This is certainly true when the decisions of such federal courts themselves are in conflict. 21 C.J. S., Courts, p. 377, § 206; *Brown v. Palmer Clay Products Co.* (1935), 290 Mass. 108, 185 N.E. 122, 123; *State ex rel. v. Taylor* (1923), 298 Mo. 474, 251 S.W. 383, 387.

*F.E. Mathias Lumber Co.*, 113 Ind.App. at 136–137, 47 N.E.2d at 159.

The Fair Housing Act, commonly referred to as Title VIII (the "Act"),

---

4. McGlothin's counterclaim was brought under the federal Fair Housing Act only. McGlothin made no argument at trial regarding the Indiana Fair Housing Act, Ind.Code § 22–9.5–1–1 through Ind.Code § 22–9.5–11–3, and the Indiana Fair Housing Act is not at issue in the appeal. We also note that the federal Fair Housing Act provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief with respect to such discriminatory housing practice or breach." 42 U.S.C. § 3613(a)(1)(A). Thus, we have jurisdiction to consider this issue.

makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The Act was passed "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The statute was intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Hispanics United of DuPage County v. Vill. of Addison*, 988 F.Supp. 1130, 1150 (N.D.Ill.1997) (citing *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights ("Arlington II")*, 558 F.2d 1283, 1289 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978)). "To fulfill this aim, courts are to apply the [Act's] terms liberally: 'It has long been recognized that to give full measure to the Congressional purpose behind the [Act], courts have given broad interpretation to the statute.'" *Id.* (quoting *Snyder v. Barry Realty, Inc.*, 953 F.Supp. 217, 219 (N.D.Ill.1996)); *see also Gomez v. Chody*, 867 F.2d 395, 402 (7th Cir.1989) ("Courts have thus applied the Act broadly within its terms."), *reh'g denied*.

▇▇▇▇ There are two theories of discrimination by which plaintiffs may proceed under the Act: (1) disparate treatment (i.e., intentional discrimination);[5] and (2) disparate impact (i.e., discriminatory effect). *Cavalieri–Conway v. L. Butterman & Assoc.*, 992 F.Supp. 995, 1002 (N.D.Ill.1998), *aff'd by* 172 F.3d 52 (7th Cir.1999), *cert. denied*, 528 U.S. 847, 120 S.Ct. 121, 145 L.Ed.2d 103 (1999); *Anast v. Commonwealth Apartments*, 956 F.Supp. 792, 800 (N.D.Ill.1997). Only disparate impact is at issue here. Such claims arise where a "facially neutral policy or action has an unequal impact on different subgroups in the housing market." *Phillips v. Hunter Trails Cmty. Ass'n*, 685 F.2d 184, 189 (7th Cir.1982).

Despite decades of litigation, a uniform standard for determining liability based upon disparate impact remains elusive, and the disparate impact jurisprudence has been described as "an increasingly incoherent body of case law." Peter E. Mahoney, *The End(s) of Disparate Impact: Doctrinal Reconstruction, Fair and Lending Law, and the Antidiscrimination Principle*, 47 EMORY L.J. 409 (Spr.1998) ("Notwithstanding the large number of cases decided employing [the disparate impact label], the standard in the fair housing/fair lending arena continues to be sketchy and haphazard."). In *Hispanics United of DuPage County v. Vill. of Addison*, 988 F.Supp. 1130 (N.D.Ill.1997), the district court engaged in an extensive analysis of disparate impact jurisprudence. We find the analysis in *Hispanics United* persuasive. In examining the burden of proof, the court began by noting:

[Fair Housing Act] disparate impact jurisprudence relies heavily on Title VII case law, which forces the employer to defend its interests by imposing on it the burden of proving business necessity to rebut a prima facie case of discriminatory effect. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431–33, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Indeed, the Seventh Circuit has recognized that the *Arlington Heights II* analysis "was

---

5. To establish a prima facie case of disparate treatment, a plaintiff "may establish that a defendant had a discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test." *Kormoczy v. HUD*, 53 F.3d 821, 823–824 (7th Cir.1995).

in fact though not in words the 'disparate impact' analysis familiar from Title VII cases." *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990).

*Hispanics United*, 988 F.Supp. at 1160. Under the Seventh Circuit's Title VII disparate impact jurisprudence:

> To succeed on a disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race. Once this impact is shown, the defendant must demonstrate that the practice is "job related" and "consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). If the defendant makes this showing, plaintiffs can still prevail by demonstrating that an alternative employment practice exists, and the defendant refuses to adopt it. *See* 42 U.S.C. § 2000e–2(k)(1)(A); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

*Allen v. City of Chicago*, 351 F.3d 306, 311–312 (7th Cir.2003). Similarly, in *Hispanics United*, the district court concluded that if a plaintiff makes a prima facie showing, the defendant has the burden of proving a bona fide and legitimate justification for the housing action. *Hispanics United*, 988 F.Supp. at 1162. If the defendant makes this showing, the plaintiff has the burden of proving that less discriminatory alternatives were available. *Id.*

In general, the federal courts with the Seventh Circuit have held that "Plaintiffs can establish a prima facie disparate impact case under the [Act] simply by showing that Defendants' actions had discriminatory effects upon a protected class."[6] *Wallace v. Chicago Hous. Auth.*, 321 F.Supp.2d 968, 973–974 (N.D.Ill.2004) (citing *Arlington II*, 558 F.2d at 1289–90, and *Snyder*, 953 F.Supp. at 219). "The question in any disparate impact claim under the [Act] is 'whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class.'" *Id.* (quoting *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir.1996), *reh'g denied, cert. denied*, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996)).

Additionally, in *Arlington II*, the Seventh Circuit held that "at least under some circumstances a violation of [42 U.S.C. § ] 3604(a) can be established by a showing of discriminatory effect without a showing of discriminatory intent." *Arlington II*, 558 F.2d at 1290; *see generally* John E. Theuman, *Evidence of Discriminatory Effect Alone as Sufficient to Prove, or to Establish Prima Facie Case of, Violation of Fair Housing Act (42 USCA §§ 3601 et seq.)*, 100 A.L.R. Fed. 97. The court went on to hold as follows:

> Plaintiffs contend that once a racially discriminatory effect is shown a violation of section 3604(a) is necessarily estab-

---

**6.** In analyzing an Indiana Fair Housing Act claim, the Indiana Supreme Court, relying upon federal cases, discussed the disparate impact analysis and noted:

> [T]o establish a prima facie case of disparate impact, a plaintiff must prove that the defendant's actions had a discriminatory effect. *United States v. Badgett*, 976 F.2d 1176, 1178 (8th Cir.1992). If the plaintiff succeeds, then the burden shifts to the defendant to articulate a legitimate, non-dis-

criminatory reason for its action. *Id.* If the defendant satisfies this burden, then the plaintiff has the opportunity to prove that the legitimate reasons asserted by the defendant are in fact mere pretext. *Id.*

*State, Civil Rights Comm'n v. County Line Park, Inc.*, 738 N.E.2d 1044, 1049 (Ind.2000). However, disparate impact was not at issue in *County Line Park*, and the court did not analyze the issue further.

lished. We decline to extend the reach of the Fair Housing Act this far. Although we agree that a showing of discriminatory intent is not required under section 3604(a), we refuse to conclude that every action which produces discriminatory effects is illegal. Such a per se rule would go beyond the intent of Congress and would lead courts into untenable results in specific cases. *See* Brest, [The Supreme Court, 1975 Term *Foreword: In Defense of the Antidiscrimination Principle*, 90 HARV. L.REV. 1, 29 (1976) ]. Rather, the courts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted under the statute.

We turn now to determining under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate section 3604(a). Four critical factors are discernible from previous cases. They are: (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis* [, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing.

*Arlington II*, 558 F.2d at 1290. The Seventh Circuit clarified in *Phillips v. Hunter Trails Community Association* that "statistical disproportion alone was not enough [in a disparate impact case], but neither did a plaintiff have to prove discriminatory intent to succeed on his purely statutory claim" and rephrased the four factors as: "(1) the strength of the plaintiff's statistical showing; (2) the legitimacy of the defendant's interest in taking the action complained of; (3) some indication—which might be suggestive rather than conclusive—of discriminatory intent; and (4) the extent to which relief could be obtained by limiting interference by, rather than requiring positive remedial measures of, the defendant." [7] *Phillips*, 685 F.2d at 189–190. However, the Seventh Circuit has not clarified whether the factors are part of the plaintiff's prima facie case or whether they are to be considered in the final determination on the merits. *Compare Hispanics United*, 988 F.Supp. at 1151, with *Snyder*, 953 F.Supp. at 220; *see also Reese v. Miami–Dade County*, 242 F.Supp.2d 1292, 1304 n. 9 (S.D.Fla.2002), *aff'd by* 77 Fed.Appx. 506 (11th Cir.2003). After an analysis of both positions, the court in *Hispanics United* concluded that the factors are "used to navigate to a conclusion on the merits" rather than establish a prima facie case. *Hispanics United*, 988 F.Supp. at 1153. We find the analysis of *Hispanics United* to be persuasive and will consider the applicability of the *Arlington II* factors in making a final determination on the merits.[8]

---

**7.** The Seventh Circuit has recognized that the "disparate impact analysis is not appropriate is certain contexts." *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272 (7th Cir.1995) (citing *NAACP v. American Family Mutual Ins.*, 978 F.2d 287 (7th Cir.1992), *reh'g denied*, *cert. denied*, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993), and *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir.1990), *reh'g*

*denied* ). Neither party argues that these cases are applicable here.

**8.** Relying upon *Betsey v. Turtle Creek Assoc.*, 736 F.2d 983 (4th Cir.1984), McGlothin argues that the *Arlington II* factors are applicable only to governmental bodies. In *Betsey*, the court held:

### A. *Arlington II Factors.*

Because several of the *Arlington II* factors are relevant to the burden-shifting analysis, we will begin by analyzing the *Arlington II* factors.

#### 1. *Statistical Showing.*

 The first *Arlington II* factor is "the strength of [McGlothin's] statistical showing." [9] *Phillips*, 685 F.2d at 190. On this issue, the trial court found:

> 18. According to the U.S. Census Bureau 2000 Census the population of the City of Kokomo is 46,113. 39,242 of those are White alone and 6,023 are persons of races other than White. 4,770 are classified as African American alone. 2,080, or 44% of the African American population resides in Census Tract 2, which is a relatively small area located east and northeast of Kokomo's downtown business area. The area is designated by the City of Kokomo as a low-moderate income area. In that Census Block 370 units are renter occupied and 519 are owner occupied by African American householders.

> 19. Of the 149 lots in Villas West II, there are 147 dwellings owned by white persons and 2 dwellings owned by African Americans. The racial mix of Villas West II is 98.7% white to 1.3% African American. The racial mix of the City of Kokomo is 86.69% white to 10.54% African American and 2.77% other racial minorities.

> 20. In the City of Kokomo there are 1,925 housing units which are occupied by African American householders. 889 of those are occupied by householders who own units and 1,036 are occupied by householders who rent units. 1,036 [divided by] 1,925 = 54% of African American householders in the City of Kokomo rent their dwellings. The average household size of housing units occupied by African American householders is 2.4 persons. Doing the math, there are $1,036 \times 2.4 = 2,486$ persons who live in African American rented housing units.

> 21. The covenants which remove housing units within Villas West II from the rental market effectively exclude the 1,036 African American householders who rent housing units from the

---

As the last component of this analysis suggests, the [*Smith v. Town of*] *Clarkton*[, 682 F.2d 1055 (4th Cir.1982), i.e., *Arlington II*] test has been applied only in situations where a public body is the defendant. Where, as here, a private entity is involved the analysis is more straightforward. The inquiry is whether either discriminatory intent or impact can be proved and, if either or both is proved, whether there is a legitimate non-discriminatory reason sufficient to overcome the showing of intent, or whether a compelling business necessity exists, sufficient to overcome the showing of disparate impact. Obviously, a business necessity test is inapplicable in situations where the defendant is a public entity. The *Clarkton* formulation similarly has no application to private defendants. *Betsey*, 736 F.2d at 989 n. 5. However, in *Snyder*, 953 F.Supp. at 220, the Northern District of Illinois applied the *Arlington II* factors to a private defendant. Moreover, although the Seventh Circuit in *Phillips* ultimately determined that the plaintiff succeeded on a disparate treatment theory and did not apply the disparate impact analysis, the court discussed the *Arlington II* factors and did not mention the fact that the case involved a private rather than public defendant. *Phillips*, 685 F.2d at 190. Consequently, we reject McGlothin's contention that the *Arlington II* factors are inapplicable.

**9.** A good analysis of such statistical evidence is found in *Hallmark Developers, Inc. v. Fulton County, Ga.*, 386 F.Supp.2d 1369 (N.D.Ga.2005), and *J & V Dev., Inc. v. Athens–Clarke Co.*, 387 F.Supp.2d 1214 (M.D.Ga. 2005).

subdivision. That is, 54% of all African American householders in Kokomo are excluded from the subdivision.

22. In the City of Kokomo there are 2,602 housing units which are occupied by racially minority householders. 1,156 of these are occupied by householders who own units and 1,446 of those are occupied by householders who rent units. 1,446 [divided by] 2,602 = 56% of all racially minority householders in Kokomo rent their dwellings.

23. The covenants which remove housing units in Villas West II from the rental market effectively exclude the 1,446 racially minority householders who rent housing units in the City of Kokomo from the subdivision.

24. There are 18,827 housing units which are owned or rented by White along householders in the City of Kokomo. 6,431 are renter occupied. Therefore 6,431 [divided by] 18,827 = 34% of White alone householders are excluded from the subdivision by the covenants.

25. The covenants exclude 56% of racial minority householders from the subdivision, and only 34% White alone householders from the subdivision.

26. According to the testimony of Dr. Lauster, the models which he used showed that African American householders in Kokomo are far more likely to rent their homes than white householders. For example, comparing 30 year old persons with $40,000 per year income, an African American person has a 68% chance of renting a home as compared to a white person who has only a 34% chance of renting a home.

27. The covenants have a greater adverse effect on the African American and racial minority householders than on white householders.

28. The covenants limit interracial association between residents of Villas West II and householders of minority races to those householders of minority races who are able to buy homes in the subdivision, to the total exclusion of racial minority households who could rent homes in the subdivision if homes were available.

29. By the Association's evidence, 27% or 28% of African American households have income sufficient to rent homes in Villas West II if such homes were available for rent.

30. By excluding all renters from Villas West II, the Association excludes minority households who can afford to rent homes in the subdivision as well as those who cannot afford to rent homes in the subdivision.

Appellant's Appendix at 15–18. The trial court concluded that: "The statistics that [McGlothin] presented to the Court clearly prove that the restriction has a significantly greater negative impact on African American members of this community than it does on the Caucasian population." *Id.* at 20

The trial court found, and the Association does not dispute, that 54% of all African American householders in Kokomo rent, while 34% of all Caucasian householders in Kokomo rent. Further, comparing 30–year–old persons with a $40,000 per year income, 68% of such African Americans rent as compared to only 34% of such Caucasian persons. The Association's expert testified that the approximate market value of McGlothin's home is $101,000, and the approximate market value for rental of the home is $750 to $800 per month. Further, only 27–28% of African American renters could afford to rent the residence. The Association's expert gave no indication of the percentage of Caucasians that could afford to rent the

residence. We conclude that the evidence presented at trial establishes that McGlothin made a significant statistical showing of a disparate impact, and this factor weighs in favor of McGlothin. *See, e.g., Hispanics United,* 988 F.Supp. at 1155 (concluding that the plaintiffs demonstrated a discriminatory effect where 49 percent of those affected by the redevelopment plans were Hispanic while only 13.4 percent of the village's population was Hispanic).

## 2. *Legitimacy of the Association's Interest.*

The next *Arlington II* factor is "the legitimacy of the defendant's interest in taking the action complained of." *Phillips,* 685 F.2d at 190. In *Arlington II,* the Seventh Circuit noted that "[i]f the defendant is a private individual or a group of private individuals seeking to protect private rights, the courts cannot be overly solicitous when the effect is to perpetuate segregated housing." *Arlington II,* 558 F.2d at 1293 (citing *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir.1976)).

On this issue, the trial court found: "The Association's reason for excluding renters from the subdivision is that renters do not maintain homes which they rent as well as owners maintain their homes. Therefore, the exclusion of renters helps maintain property values." Appellant's Appendix at 18. The trial court found "no showing that the limiting of occupancy of dwellings within Villas West II to owners and members of their immediate families is a business necessity," "no business necessity that owners of dwellings within Villas West II be prohibited from renting or leasing their dwellings," and "no business necessity that the class of person designated as 'renters' be excluded from Villas West II." *Id.* at 19. Thus, the trial court concluded that it could "find no legitimate

non-discriminatory reason for limiting occupancy of dwellings within Villas West II to owners and members of their immediate families." *Id.*

The Association argues that restrictive covenants that prevent leasing are found throughout the United States and that such covenants have a positive effect in maintaining property values. The Association's expert, Paul Wyman, testified that covenants restricting or prohibiting leasing either increase or help maintain property values because renters generally do not maintain houses as well as owners. Although McGlothin's expert, Nick Tillema, testified on direct examination that such covenants against leasing reduce property values by restricting a homeowner's rights, Tillema testified on cross examination that he had used such covenants in his properties by allowing only ten percent of the homes to be leased. Tillema further testified that if all of the properties in a development could be leased, it might adversely affect property values.

The developer of Villas West II testified that McGlothin's residence was a "duplex condo-style" home but not a true condominium. Transcript at 161. However, the developer did not explain the difference between these concepts. We note that other courts have recognized that condominiums are unique. In *Woodside Village Condominium Assoc.,* the Florida Supreme Court noted:

From the outset, courts have recognized that condominium living is unique and involves a greater degree of restrictions upon the rights of the individual unit owners when compared to other property owners. *See Seagate Condominium Ass'n[ v. Duffy,* 330 So.2d 484, 486 (Fla.Dist.Ct.App.1976) ] (citing cases). For instance, in *White Egret Condominium, Inc. v. Franklin,* 379 So.2d 346 (Fla.1979), we recognized that

"[r]easonable restrictions concerning use, occupancy and transfer of condominium units are necessary for the operation and protection of the owners in the condominium concept." *Id.* at 350. In *White Egret*, we quoted favorably from *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180 (Fla. 4th DCA 1975), to further explain the restrictive nature of condominium ownership and living:

> [I]nherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization.

*White Egret*, 379 So.2d at 350. Consistent with this analysis of condominium ownership, courts have acknowledged that "increased controls and limitations upon the rights of unit owners to transfer their property are necessary concomitants of condominium living." *Aquarian Foundation, Inc. v. Sholom House, Inc.*, 448 So.2d 1166, 1167 (Fla. 3d DCA 1984). Indeed, section 718.104(5), Florida Statutes (2000), expressly recognizes that a declaration of condominium may contain restrictions concerning the use, occupancy, and transfer of units. *See* § 718.104(5), Fla. Stat. (2000).

Courts have also consistently recognized that restrictions contained within a declaration of condominium should be clothed with a very strong presumption of validity when challenged.

*Woodside Vill. Condo. Assoc.*, 806 So.2d at 456–457.

The trial court focused upon whether the Association has a "business necessity" for the restrictive covenant. However, the proper consideration is whether the Association had a legitimate interest in restricting leasing. Even McGlothin's expert agreed that leasing can have an adverse effect on property values. Additionally, the unique nature of these "condo-style" homes provide a legitimate justification for a leasing restriction. Thus, this *Arlington II* factor weighs in favor of the Association.

### 3. Indication of Discriminatory Intent.

The next *Arlington II* factor is "some indication—which might be suggestive rather than conclusive—of discriminatory intent." *Phillips*, 685 F.2d at 190. This factor "is the least important of the four factors, ... and the required showing under it is modest." *Hispanics United*, 988 F.Supp. at 1157 (citing *Arlington II*, 558 F.2d at 1292).

The trial court found no indication of discriminatory intent of the Association. However, the trial court did make the following findings that are relevant to this analysis:

13. Villas West II is a part of the Willowridge Community. Jim Bagley Construction Co., Inc. advertises the Willowridge Community as "Restricted—your investment is protected here."

14. The word, "restricted," is defined by Webster's Third International Dictionary (1993), as "limited to the use of a particular class of people or specifically excluding others (as members of a class or ethnic group felt to be

inferior)(a residential area)(-hotels..." Other dictionary definitions include "... limited to white Christians," and "... limited to or admitting only members of a particular group or class, esp. white gentiles." Appellant's Appendix at 14. The trial court also noted that "[o]f the 149 lots in Villas West II, there are 147 dwellings owned by white persons and 2 dwellings owned by African Americans." *Id.* at 15. The trial court then concluded:

> Whether the builder of the tract realized it or not, the words "restricted," as used in its advertisements clearly sent a message to the African American community. Dr. Herbert Mitler, an African American professor at Indiana University–Kokomo, himself a victim of past discrimination, very eloquently and convincingly described how the word "restricted" is what the black community commonly knows to be a "code word" indicating that African Americans (and perhaps other minorities) are not welcome.
>
> While the Plaintiff demonstrated that a few African Americans do own homes in Villas West II, thereby attempting to counter any discriminatory effect argument, such evidence was not persuasive. Thankfully, this country's laws are *now* such that it is virtually impossible to *manifestly* deny ownership of a home to a minority member or family. A no-rent provision accomplishes a similar goal, however, in a more subtle way.

*Id.* at 19–20.

The Association argues that the advertisement of Jim Bagley Construction cannot be imputed to the Association. While in general we would agree with the Association, we note that Jim Bagley Construction recorded the covenants at issue here. The Association is charged with enforcing the covenants recorded by Jim Bagley Construction. Thus, although there is no indication of discriminatory intent of the Association, evidence suggestive of discriminatory intent of Jim Bagley Construction would be relevant to whether the covenant has a legitimate purpose.[10] We conclude that this factor weighs slightly in favor of McGlothin.

#### 4. *Extent of Relief.*

■ The final *Arlington II* factor is "the extent to which relief could be obtained by limiting interference by, rather than requiring positive remedial measures of, the defendant." *Phillips,* 685 F.2d at 190. The trial court made no findings on this issue. However, relief here could be obtained by limiting the Association's right to enforce the leasing covenant rather than requiring the Association to institute positive remedial measures. Thus, this factor weighs in favor of McGlothin.

### B. *Burden of Proof.*

As noted above, if a plaintiff makes a prima facie showing, the defendant has the burden of proving a bona fide and legitimate justification for the housing action. *Hispanics United,* 988 F.Supp. at 1162. If the defendant makes this showing, the plaintiff has the burden of proving that less discriminatory alternatives were available. *Id.*

#### 1. *McGlothin's Prima Facie Case.*

■ As noted above, the federal courts in the Seventh Circuit have held that

---

10. McGlothin also relies upon Kokomo's "sordid history of perverse willful schemes for perpetuating segregation through restrictive covenants" that limited occupancy to those of "the pure white race." Appellee's Brief at 29; Appellee's Appendix at 18. Such evidence is not relevant or suggestive of discriminatory intent on the part of Jim Bagley Construction or the Association with respect to the restrictive covenant barring leasing.

"Plaintiffs can establish a prima facie disparate impact case under the [Act] simply by showing that Defendants' actions had discriminatory effects upon a protected class." *Wallace*, 321 F.Supp.2d at 973–974. Disparate impact in fair housing cases can be illustrated with statistics. *Hispanics United*, 988 F.Supp. at 1154. "Local, not national, statistics are usually most pertinent, and the analysis 'must involve the appropriate comparables.'" *Id.* (quoting *Mountain Side Mobile Estates P'ship v. Sec'y of HUD*, 56 F.3d 1243, 1251, 1253 (10th Cir.1995)). The Association does not dispute that McGlothin made a statistical showing of a disparate impact. Appellant's Brief at 13 ("[McGlothin] did assert voluminous statistical evidence and may have asserted sufficient evidence to make a prima facie showing of disparate impact."). Thus, McGlothin made a prima facie case, and we will consider whether the Association had a bona fide and legitimate justification.

### 2. *The Association's Bona Fide and Legitimate Justification.*

■ If a plaintiff makes a prima facie showing, the defendant has the burden of proving a bona fide and legitimate justification for the housing action. *Hispanics United*, 988 F.Supp. at 1162. Because McGlothin made a prima facie showing of a violation of the Act, the Association had the burden of proving a bona fide and legitimate justification for the restrictive covenant. The Association argued that the leasing restriction had a positive effect on property values. As we noted in discussing the *Arlington II* factors, even McGlothin's expert agreed that leasing can have an adverse effect on property values. Additionally, the unique nature of these "condo-style" homes provide a legitimate justification for a leasing restriction. Thus, we conclude that the Association provided a bona fide and legitimate justification for the covenant against leasing.

### 3. *Availability of Less Discriminatory Alternatives.*

■ If the defendant demonstrates a bona fide and legitimate justification, as the Association did here, the plaintiff then has the burden of proving that less discriminatory alternatives were available. *Hispanics United*, 988 F.Supp. at 1162. The trial court found:

[T]he Declaration of Covenants contains numerous provisions requiring proper maintenance; these include the following, which are included herein by reference:

| Article V. | Sections 1 |
|---|---|
| Article V. | Sections 2 |
| Article V. | Sections 2–A |
| Article IX. | Sections 3(a) |
| Article IX. | Sections 3(c) |
| Article IX. | Section 3(d) |
| Article IX. | Section 3(e) |
| Article IX. | Section 3(f) |
| Article IX. | Section 3(g) |
| Article IX. | Section 3(i) |
| Article IX. | Section 3(j) |

The Plaintiff has, by these provisions, more than adequately assured a neat, clean and visually attractive environment, and a high degree of property maintenance. The Defendant would still be held to these requirements even while renting her home. Therefore, the Plaintiff's justification for the no-rent provision lacks a factual basis, and is mere subterfuge, rendering said provision unnecessary and useless.

Appellant's Appendix at 18–19.

The covenants cited by the trial court in its findings govern exterior maintenance, maintenance of the dwelling, watering of lawns and shrubs, and prohibited uses and nuisances, such as noxious or offensive activities, accumulation of litter or trash, accumulation of junk vehicles, campers,

boats, etc. on the property, construction of outbuildings, and leaving garage doors open. The trial court basically found that, if the basis for the leasing covenant is to maintain property values because renters do not care for the residences as well as owners, the properties can be maintained just as well through the covenants listed above. We cannot say that this finding is clearly erroneous.

In summary, we conclude that the trial court's finding that the restrictive covenant against leasing violated the Fair Housing Act is not clearly erroneous. McGlothin made a prima facie showing of a violation of the Act, and, although the Association demonstrated a bona fide and legitimate justification for the housing action, McGlothin showed that less discriminatory alternatives were available. *Hispanics United*, 988 F.Supp. at 1162. Of the four *Arlington II* factors, three factors favor McGlothin, although one of those factors favors her only slightly, and one factor favors the Association. While we think this is a close case, we cannot say the trial court's finding of a violation of the federal Fair Housing Act is clearly erroneous. In doing so, we do not intend to imply that all restrictive covenants prohibiting leasing violate the federal Fair Housing Act. Rather, this is complex, fact-sensitive analysis that should not be taken to apply to all such covenants.[11]

For the foregoing reasons, we affirm the trial court's judgment in favor of McGlothin.

Affirmed.

DARDEN and BAILEY, JJ., concur.

---

11. Because we conclude that the trial court's findings on the Fair Housing Act are not clearly erroneous, we need not address McGlothin's argument that the judgment is sustainable on equitable grounds.