# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 12, 2006         Decided April 14, 2006

No. 04-7126

2922 SHERMAN AVENUE TENANTS' ASSOCIATION, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

DISTRICT OF COLUMBIA,
APPELLANT/CROSS-APPELLEE

———

Consolidated with
04-7127, 04-7174, 04-7185, 04-7196

———

Appeals from the United States District Court
for the District of Columbia
(No. 00cv00862)

———

*James C. McKay, Jr.*, Senior Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellant/cross-appellee. With him on the briefs were *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General.

*Philip M. Musolino* was on the brief for cross-appellant Andrew J. Serafin.

*Reed N. Colfax* argued the cause for appellees/cross-appellants. With him on the briefs were *John P. Relman, Eliza T. Platts-Mills, Bruce V. Spiva*, and *Hassan A. Zavareei. David W. DeBruin* and *Denise L. Gilman* entered appearances.

*Jeffrey T. Green* and *Joseph R. Palmore* were on the brief for *amici curiae* National Fair Housing Alliance, et al. in support of appellees/cross-appellants. *Virginia A. Seitz* entered an appearance.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Charging that the District of Columbia targeted Hispanic neighborhoods when it decided to close certain apartment buildings for housing code violations, several tenants' groups brought both disparate treatment and disparate impact discrimination claims against the city under the Fair Housing Act (FHA) and D.C. Human Rights Act (DCHRA). The district court allowed only the FHA disparate impact claim to go to the jury, which then returned a verdict favoring the tenants with regard to one building. The city now appeals that verdict, while the tenants cross-appeal the district court's (1) order granting judgment as a matter of law to the city on their FHA disparate treatment claim, and (2) refusal to instruct the jury on their DCHRA claim. Because we agree with the city that the tenants failed to demonstrate that its actions had a disproportionate impact on Hispanics, we reverse and remand with instructions to set aside the jury verdict and grant judgment to the District on the FHA disparate impact claim. But because the tenants offered sufficient evidence of intentional discrimination to support their FHA disparate treatment claim, and because the district court should have instructed the jury on their DCHRA claim, we remand those claims for a new trial.

3

**I**.

Located just west of the border between northwest and northeast Washington, D.C., Columbia Heights is, by all accounts, a neighborhood in transition. A low-income and disproportionately Hispanic community for many years, Columbia Heights became the focus of multimillion dollar redevelopment efforts after a metro station opened there in September 1999. In April 2000, the tenants of several Columbia Heights apartment buildings sued the District of Columbia in U.S. District Court alleging that in attempting to gentrify the neighborhood—an effort that culminated in the closing or attempted closing of their buildings—the city violated federal and local fair housing laws. Both the tenants and the District filed cross-claims against the landlords. In April 2004, the tenants' claims regarding three buildings—1512 Park Road, 1458 Columbia Road, and 2922 Sherman Avenue—went to trial. The following evidence was presented:

In early 2000, District officials launched a program, known as the "Hot Properties Initiative," to enforce the housing code aggressively in the city's "worst" multi-family apartment buildings. Supp. App. 24, 32-33. Administered by the District's Neighborhood Stabilization Program (NSP), the Initiative, according to District witnesses, was intended to protect the health and safety of building tenants. NSP officials began the Initiative by directing District housing inspectors to identify apartment buildings with the most dangerous and persistent housing code violations. This effort produced a list of approximately 75 buildings distributed evenly throughout the city (with the exception of its wealthiest neighborhoods, Dupont Circle, Georgetown, and upper Northwest). After "paring the list down," *id*. at 21, the NSP director passed it along to officials at NSP's overseeing agency, the Department of Consumer and Regulatory Affairs (DCRA). DCRA officials then made

additional alterations to the list, removing many buildings and adding others. Soon after, NSP released a final "Hot Properties List" identifying what it said were the city's 27 worst buildings. On average, these buildings were located in neighborhoods where the percentage of Hispanic residents was 4.1 times the percentage of Hispanics in the city as a whole. Not one city witness was able to explain why the List concentrated so heavily on Hispanic neighborhoods.

After DCRA's director informed NSP officials that he wanted the Hot Properties buildings closed, NSP posted closure notices at five buildings in and around Columbia Heights, where the percentage of Hispanic residents was 4.4 times the percentage of Hispanics in the city as whole. The tenants of several buildings, including 2922 Sherman Avenue and 1458 Columbia Road, filed a motion for a temporary restraining order. The District then postponed the closure dates and eventually abandoned its efforts to close the buildings.

Several months later, however, the District targeted another Hot Properties building, 1512 Park Road, for closure. Although almost a year earlier an inspector had reported electrical problems and a missing fire escape at the Park Road building, the District not only failed to make any effort to remedy these code violations, but also gave the tenants just "a few minutes" notice before evacuating the building. J.A. 159. The city declined to provide any relocation assistance, leaving the tenants homeless.

The tenants also presented evidence that in closing 1512 Park Road and attempting to close 2922 Sherman Avenue and 1458 Columbia Road, the District strayed from its general practice of considering alternatives to closure, such as (1) using a specially designated fund, the "5-513 fund," to abate the

violations and (2) seeking civil penalties against or criminal prosecution of the landlords.

In their lawsuit, the tenants argued that the District's actions violated the Fair Housing Act, 42 U.S.C. §§ 3601-3631, which prohibits discrimination in housing on the basis of (among other things) race or national origin. *See id*. § 3604. Although the tenants articulated two theories of discrimination, disparate impact and disparate treatment—we shall say more about the difference later—the district court concluded at the close of the tenants' case-in-chief that they had failed to provide sufficient evidence to establish disparate treatment. Accordingly, the district court granted judgment to the city on that claim. The tenants also claimed that the city's actions amounted to "place of residence" discrimination in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.21(a). But the district court, finding the DCHRA inapplicable to the form of discrimination the tenants alleged, refused to instruct the jury with respect to that claim.

Thus allowed to consider only the tenants' FHA disparate impact claim, the jury found the District liable for closing 1512 Park Road, but not for posting closure notices at either 2922 Sherman Avenue or 1458 Columbia Road. After hearing additional testimony regarding damages, the jury awarded a total of $181,500 to twelve former Park Road occupants, only two of whom were Hispanic.

The District now appeals the 1512 Park Road verdict, while the tenants cross-appeal the district court's refusal to instruct the jury on their DCHRA claim and its order granting judgment as a matter of law to the city on their FHA disparate treatment claim. The landlord of 1458 Columbia Road, Andrew Serafin, also appeals, arguing that the district court erred in denying his motion to dismiss the District's cross-claim against him.

6

**II.**

We begin with the tenants' FHA claims. As relevant here, the FHA makes it unlawful

(a) To . . . make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status or national origin.

42 U.S.C. § 3604(a)-(b). As noted above, the tenants rest their FHA claim on two distinct theories. First, they argue that the record reveals evidence of disparate treatment, i.e., that in adopting the Hot Properties Initiative and selecting their buildings for closure, the District intentionally discriminated against Hispanics. Second, they argue that even if unable to prove intentional discrimination, they can nonetheless prevail because the Hot Properties Initiative had a disparate impact on Hispanics. *See Palmer v. Shultz*, 815 F.2d 84, 90 (D.C. Cir. 1987) (describing the difference between disparate treatment and disparate impact).

Although the Supreme Court has barred constitutional disparate impact claims, *see Washington v. Davis*, 426 U.S. 229 (1976), it has permitted such claims when brought pursuant to federal law. In the seminal case on this issue, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the Supreme Court considered whether, absent evidence of discriminatory intent, an employment test that had a disproportionate impact on black

workers could violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, which bars employment discrimination "because of . . . race . . . or national origin." Answering yes, the Court explained that Congress intended Title VII to prohibit, in addition to intentional discrimination, certain practices having an unintended discriminatory impact:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

*Griggs*, 401 U.S. at 431. In other words, to prove a disparate impact claim in the employment context, a plaintiff must first demonstrate that the challenged policy or practice has a disproportionate effect on a protected class. If the plaintiff makes this showing, the employer can prevail only by demonstrating that its practice was consistent with business necessity. *See, e.g., Arnold v. U.S. Postal Serv.*, 863 F.2d 994, 996 (D.C. Cir. 1988); *see also* 42 U.S.C. § 2000e-2(k)(1)(A)-(C) (expressly extending Title VII to disparate impact claims).

The Supreme Court has yet to consider the availability of disparate impact claims under the FHA. Significantly, however, the FHA's language prohibiting discrimination—"because of . . . race . . . or national origin"—is identical to Title VII's, and since *Griggs*, every one of the eleven circuits to have considered the issue has held that the FHA similarly prohibits not only intentional housing discrimination, but also housing actions having a disparate impact. *See* John F. Stanton, *The Fair Housing Act and Insurance: An Update and the Question of Disability Discrimination*, 31 Hofstra L. Rev. 141, 174 n.180

(2002) (listing cases). The tenants urge us to take the same approach here. Expressing no view on the issue, the District "assume[s] *arguendo* that a violation of the FHA may be found based on evidence of disparate effect alone." District's Br. 33 n.5. Given that only one side of the issue has been briefed, however, instead of simply adopting the approach of our respected sister circuits, we think it more appropriate to assume without deciding that the tenants may bring a disparate impact claim under the FHA.

*Disparate Impact*

Recall that the district court allowed the jury to hear the tenants' FHA disparate impact claim, and that the tenants prevailed with respect to one building, 1512 Park Road. On appeal, the District argues that the record contains insufficient evidence of disparate impact and that the district court therefore erred in denying its motion for judgment as a matter of law. As always, we review de novo a trial court's denial of judgment as a matter of law, setting aside the jury's verdict only if "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree" that the verdict is in error. *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1113 (D.C. Cir. 2001) (internal quotation marks omitted).

In one of the first cases to permit an FHA disparate impact claim, *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977), the Seventh Circuit emphasized that not "every action which produces discriminatory effects is illegal," *id*. at 1290. The court identified four factors for determining whether conduct that produces a disparate impact violates the FHA: (1) the strength of the plaintiff's showing of discriminatory effect; (2) whether any evidence indicates discriminatory intent; (3) the defendant's interest in taking the challenged action; and (4) whether the

plaintiff seeks to compel the defendant to affirmatively provide housing to a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *Id.*

Believing it would place "too onerous a burden" on plaintiffs to treat these four factors "as steps necessary to make out a prima facie case" of discriminatory effect, the Second Circuit developed a burden-shifting framework: once the plaintiff demonstrates the challenged practice has a disproportionate impact, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2d Cir. 1988), *aff'd on other grounds*, 488 U.S. 15, 18 (1988). Several circuits have adopted this burden-shifting framework. *See, e.g.*, *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 901-02 (8th Cir. 2005); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000).

In this case, the tenants emphasize the Second Circuit's framework, while the city relies primarily on the Seventh Circuit's four-factor inquiry. We need not adopt one approach over the other, however, for under either approach the tenants' claim fails. Both approaches require proof of disproportionate impact, and as we explain below, the tenants produced no such evidence.

Pointing out that only two of the twelve tenants awarded damages were Hispanic, the District argues that the tenants lose as a matter of law because they failed to satisfy their burden of establishing that the closing of 1512 Park Road had a disproportionate impact on Hispanics. This argument misstates

the tenants' claim. As the district court explained, the policy the tenants' disparate impact claim challenges is not the closing of 1512 Park Road—hardly a policy, in any event—but the Hot Properties Initiative, specifically the use of the Hot Properties List to determine which buildings to close. *See* J.A. 106-07. Under the tenants' theory of the case, the closing of 1512 Park Road is significant because it constitutes the injury they suffered as a result of the Hot Properties Initiative. To analogize again to the employment context, the city's closing of 1512 Park Road pursuant to the Hot Properties Initiative is similar to an employer's refusal to hire a single individual based on the results of an allegedly discriminatory test. To prevail, such an individual would need to show not that her failure to obtain the job disproportionately affected her protected class (such an inquiry would make little sense where the employer's action affected only one person), but rather that the test itself had a disproportionate effect on the protected class. Here, then, the question is whether the tenants satisfied their burden of establishing that the 27 buildings listed as Hot Properties had a disproportionate number of Hispanic residents.

In finding sufficient evidence of disparate impact, the district court relied on the testimony of the tenants' statistical expert, who explained that the buildings on the Hot Properties List were located, on average, in census block groups whose percentage of Hispanic residents was 4.1 times the percentage of Hispanics in the District as a whole. *See id.* at 104-06, 217-27. Seeing "no bright line rule to guide courts (or juries, or experts) in deciding whether plaintiffs' evidence has shown a significantly adverse or disproportionate impact," the district court held that the tenants had presented "enough analytical information tending to show that the District's policies had a disproportionate impact on Hispanics" to allow the jury to consider the question. *Id.* at 105-06 (internal quotation marks and citation omitted). We disagree.

To prevail on a disparate impact claim, a plaintiff must offer sufficient evidence to support a finding that the challenged policy *actually* disproportionately affected a protected class. For example, in *Allen v. Seidman*, 881 F.2d 375 (7th Cir. 1989), a post-*Griggs* employment discrimination case, the Seventh Circuit held that plaintiffs satisfied this burden by demonstrating that 84 percent of white candidates passed the challenged employment test as compared to only 39 percent of black candidates, *see id*. at 378-80. Likewise, in *Huntington Branch*, where the Second Circuit allowed an FHA disparate impact challenge to a town's public housing policy to proceed to trial, plaintiffs presented evidence that although only 5 percent of the town's population was minority, each of the town's three housing projects had between 30 and 95 percent minority residents. *See* 844 F.2d at 929.

In this case, by contrast, the tenants provided no evidence that the specific buildings on the Hot Properties List were disproportionately Hispanic. Instead, their statistical expert merely described the ethnic composition of all District neighborhoods, leaving it to the jury to infer the ethnic composition of the buildings from the ethnic composition of their respective neighborhoods. To be sure, under some circumstances a reasonable jury could infer a building's ethnic composition from the ethnic composition of its neighborhood. For example, if the city's population was 5 percent Hispanic and the neighborhood 95 percent Hispanic, one could reasonably assume that each individual building in the neighborhood was also disproportionately Hispanic. In this case, however, a reasonable jury could make no such assumption because the percentage of Hispanics in the relevant neighborhoods, while disproportionate to the 7.9 percent found in the city as a whole, averaged only 32.4 percent. *See* J.A. 224-27. Without evidence that the Hispanic population was evenly distributed throughout

the buildings in the tenants' neighborhoods, a jury could not reasonably assume that any particular building was disproportionately Hispanic. Indeed, absent such evidence, it seems just as likely that the neighborhood averages were high because some buildings were heavily Hispanic while many others were not.

Given this conclusion, we need not consider the District's argument that the tenants' disparate impact claim fails for lack of "evidence of a relevant comparison group—i.e., persons unaffected by the policy who were not in the protected group and who were similarly [situated]." District's Br. 45. As we have explained, absent evidence of the actual ethnic composition of the buildings on the Hot Properties List, no jury could reasonably conclude that the Initiative had a disproportionate impact on Hispanics. Accordingly, the district court should have granted the District's motion for judgment as a matter of law on the tenants' disparate impact claim.

*Disparate Treatment*

The next issue before us is whether the district court erred in granting judgment to the city on the tenants' FHA disparate treatment claim. Reviewing the district court's order de novo, we affirm only if no reasonable jury could find in the tenants' favor. *See Sparshott v. Feld Entm't, Inc.*, 311 F.3d 425, 429 (D.C. Cir. 2002).

In contrast to disparate impact plaintiffs, plaintiffs alleging disparate treatment must establish not that a facially neutral policy disproportionately affected a protected class, but that the defendant intentionally discriminated against them on the basis of race or ethnicity. Accordingly, the specific question we face here is whether the tenants offered sufficient evidence for a reasonable jury to conclude that the District intentionally targeted their buildings for closure because the buildings were

located in disproportionately Hispanic neighborhoods. Although we have no Circuit precedent addressing intentional housing discrimination under the FHA, plaintiffs urge us to follow the approach taken by many circuits and apply the burden-shifting framework adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), for use in employment discrimination cases. *See, e.g.*, *Sanghvi v. City of Claremont*, 328 F.3d 532, 536-38 (9th Cir. 2003); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-52 (2d Cir. 2002); *Kormoczy v. HUD*, 53 F.3d 821, 823-24 (7th Cir. 1995) (all applying *McDonnell Douglas* to FHA claims). Under that framework, plaintiffs must first present sufficient evidence to permit an inference of discrimination. If they succeed, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant meets that burden, plaintiffs may prevail by showing that the defendant's proffered reason was pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802-04. Because this approach makes sense, and because the District does not urge otherwise, we too shall apply the *McDonnell Douglas* framework.

According to the tenants, the evidence presented at trial suffices to (1) permit an inference that the District intentionally discriminated against Hispanics in deciding which buildings to close and (2) allow the jury to conclude that the District's asserted justification—protecting the health and safety of tenants living in buildings with the worst housing code violations—was pretext for discrimination. We agree.

With regard to the initial inference of discrimination, record evidence demonstrates that although the 75 buildings first recommended for inclusion on the Hot Properties List were evenly distributed throughout most of the city, the 27 buildings ultimately placed on the List were located in neighborhoods

with an average percentage of Hispanic residents 4.1 times as great as the percentage of Hispanics in the city as a whole. The five buildings posted for closure were located in even more heavily Hispanic neighborhoods—neighborhoods having an average Hispanic population 4.4 times the percentage of Hispanics in the city.

The District insists that nothing in the record demonstrates that most of the buildings initially listed but then excluded from the final Hot Properties List were in non-Hispanic neighborhoods. This is untrue. The tenants introduced maps illustrating the percentage of Hispanic residents by census block group for the entire city, the location of the 27 listed buildings, and the location of the five properties placarded for closure. A reasonable jury could rely on these maps, together with the evidence that the 75 buildings were evenly distributed throughout most of the city, *see supra* p. 3, to conclude that although the initial list had not targeted Hispanic neighborhoods, the final list did.

At trial, moreover, the District offered little explanation for how or why city officials decided to (1) eliminate from the initial list over fifty buildings recommended by the housing inspectors, or (2) add several buildings which the inspectors never identified as problem properties. As the tenants observe:

> Not a single District official could explain the sudden transformation of the list from one including buildings from every quadrant in the city, to a list almost exclusively comprised of buildings in disproportionately Hispanic neighborhoods. . . . The absence of objective justification for the District's subjective choices . . . is strongly suggestive of an intent to discriminate.

Tenants' Reply Br. 10.

At trial, District officials asserted that in listing the tenants' buildings as Hot Properties and then targeting them for closure, their intention was to protect the tenants' health and safety. The tenants, however, presented evidence that could lead a reasonable jury to disbelieve this claim. To begin with, they demonstrated that in deciding to close their buildings, the District deviated from its usual practice of considering alternative measures that would have protected the tenants while causing less disruption, such as using 5-513 funds to abate the violations or seeking civil penalties against the landlords. According to record evidence, at the time the District targeted the tenants' buildings for closure, it was spending 5-513 funds at an annual rate of between 1.3 and 1.5 million dollars. Although housing inspectors testified that they repeatedly recommended the use of such funds to abate violations at the tenants' buildings, record evidence indicates that city officials refused to consider this option. When asked why, one official explained that if the city had allocated 5-513 money to repairing code violations at the tenants' buildings, it would have "jeopardize[d]" the availability of such funds for "other areas of the city." Supp. App. 59-60. In closing 1512 Park Road, moreover, the District departed from its usual procedure of providing relocation assistance when closing buildings, leaving the tenants homeless with only a few minutes notice.

Indeed, record evidence reveals instances in which city officials treated buildings with serious code violations in non-Hispanic neighborhoods differently than it treated the tenants' buildings. One housing inspector testified about a set of apartment buildings on Ayers Place, Southeast, where she observed code violations involving smoke detectors, a defective hot water system, and mold contamination. Rather than closing

the entire complex, the District used roughly $40,000 of 5-513 funds to abate the violations. Another inspector described a building on Ames Street, Southeast, which was not among the buildings targeted for immediate closure even though it had been included on the Hot Properties List and was, according to the inspector, in "equally bad condition" when compared to 1458 Columbia Road. *Id.* at 57. The District asserts that the tenants failed to demonstrate that the Ayers Place and Ames Street buildings were located in non-Hispanic neighborhoods, but the maps the tenants introduced at trial illustrate that every census block in the city's Southeast quadrant has a lower percentage of Hispanic residents than the city as a whole. The District also asserts that the violations at the Ayers Place and Ames Street buildings were less serious than those at the tenants' buildings, particularly 1512 Park Road, which had electrical problems and lacked an adequate fire escape. But making such judgments is the jury's responsibility, and especially given the inspector's testimony that the Ames Street building was in "equally bad condition," we think a reasonable jury could find the violations at the Ayers Place and Ames Street buildings sufficiently comparable to those at the tenants' buildings to undermine the District's claim of non-discriminatory intent. *See Gunning v. Cooley*, 281 U.S. 90, 94 (1930) (explaining that it is for the jury to decide the "effect or weight of evidence").

Taken together, the tenants' evidence is more than enough under *McDonnell Douglas* to have allowed the jury to hear the disparate treatment claim. The relatively even distribution of the 75 buildings initially recommended for inclusion on the Hot Properties List, the District's failure to explain how NSP and DCRA officials selected the 27 buildings ultimately listed, and the fact that those buildings were located in disproportionally Hispanic neighborhoods all suffice to support an inference that the District intentionally targeted Hispanic neighborhoods when

it implemented the Hot Properties Initiative. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (noting that "[t]he historical background of the decision" and "[t]he specific sequence of events leading up to the challenged decision" may evidence intentional discrimination). Moreover, based on the evidence that city officials dealt with serious code violations differently in Hispanic and non-Hispanic neighborhoods, a jury could reasonably conclude that the District's purported justification for targeting the tenants' buildings for closure—to protect the tenants' health and safety—was pretext for discrimination. *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (explaining that a showing of differential treatment can "serve as evidence that the [defendant's] proffered legitimate, non-discriminatory reason for the adverse . . . action was a pretext for racial discrimination"). In reaching this conclusion, we emphasize that we are not saying that the District actually discriminated against Hispanic tenants, but only that the record contains sufficient evidence to allow a jury to make that determination.

Our earlier finding that the tenants produced insufficient evidence to support their disparate impact claim, *see supra* pp. 8-12, in no way undermines our conclusion that the disparate treatment claim should go to a jury. As noted above, the two theories are distinct. Because a disparate impact claim requires no evidence of discriminatory intent, we require plaintiffs to establish that the challenged policy *actually* had a disparate impact. In disparate treatment cases, by contrast, we focus on the defendant's motivation, not the effects of its actions. This case nicely illustrates the difference. The fact that the tenants' buildings are located in disproportionately Hispanic neighborhoods could certainly motivate someone bent on discriminating against Hispanics to close the buildings. Their location alone could therefore give rise to an inference of

discriminatory intent, even though it cannot support a conclusion that the Hot Properties Initiative *in fact* had a disparate impact on Hispanics.

The District makes several additional arguments, only one of which requires further comment. Explaining that in contrast to 1512 Park Road, it never actually closed the buildings at 2922 Sherman Avenue and 1458 Columbia Road, but merely "placarded" them, the District argues that no discrimination could have occurred with regard to those two buildings. This is incorrect. The FHA prohibits making housing "unavailable" on the basis of national origin. Although the District never forcibly removed the tenants of 2922 Sherman Avenue and 1458 Columbia Road from their apartments, it did post closure notices on both buildings for the purpose of, according to one city witness, "get[ting] the tenants to leave." Trial Tr. 221, Apr. 13, 2005. The notice posted at 1458 Columbia Road stated that "by order of the housing regulation administration this structure is declared unfit for human habitation and its occupancy and/or use is hereby prohibited." J.A. 417. The Sherman Avenue tenants received a similar notice warning that their building was "unfit for human habitation" and advising them "to seek alternative housing accommodations." *Id*. at 409. Telling the tenants either that their "occupancy . . . is . . . prohibited" or that they must "seek alternative housing" certainly qualifies as making the buildings "unavailable" under the FHA.

For all these reasons, we shall reverse the district court's grant of judgment as a matter of law to the city on the tenants' disparate treatment claim and remand for trial.

### III.

In addition to their FHA claims, the tenants charge the District with "place of residence" discrimination in violation of the D.C. Human Rights Act. *See* D.C. Code § 2-1402.21(a).

The DCHRA makes it unlawful "to refuse or restrict facilities, services, repairs or improvements for a tenant or lessee" "wholly or partially for a discriminatory reason based on . . . race, color, . . . or place of residence." *Id*. A separate provision states that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." § 2-1402.68. The D.C. Court of Appeals has held that this "effects clause" imports into the Act "the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*" *Gay Rights Coal. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987).

The district court refused to instruct the jury on the tenants' DCHRA claim, explaining that: (1) the Act does not apply to the form of housing discrimination challenged by the tenants, (2) an exception to the Act bars the tenants' claims, and (3) even if the Act applies, it is "functionally indistinguishable" from the FHA, making a separate instruction unnecessary. *See* J.A. 384-85. The tenants challenge all three rulings. We review de novo a district court's refusal to instruct the jury. *See Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993) ("An alleged failure to submit a proper jury instruction is a question of law subject to *de novo* review . . . .").

We start with the tenants' challenge to the district court's ruling that the DCHRA does not "apply by its terms" to the form of housing discrimination they allege. Explaining that the Act prohibits "refus[ing] or restrict[ing] facilities, services, repairs or improvements for a tenant or lessee" based on her place of residence, *see* D.C. Code § 2-1402.21(a)(4), the tenants assert that enforcing the housing code is a "service" provided by the District, and that "[t]he District's differential provision of those services to tenants in the Columbia Heights/Mount Pleasant area . . . falls within the ambit of acts that refuse or restrict services

contemplated by the [DCHRA]," Tenants' Br. 47. The District responds that the tenants' argument "is based on a reading of an isolated provision of the statute taken out of context." District's Reply Br. 47. Pointing to several DCHRA provisions that focus on "real property" transactions, the District asserts that the D.C. Council intended the phrase "to refuse or restrict . . . services" to apply not to the District of Columbia government, but only to actions of property owners, landlords, and lenders.

The tenants have the better argument. The relevant provision, subsection 2-1402.21(a)(4), makes no reference to "property owners, landlords, and lenders," and we see no reason to think that the presence of the phrase "real property" elsewhere in section 2-1402.21 has any bearing on subsection 2-1402.21(a)(4)'s application in this case. To the contrary, the D.C. Court of Appeals has squarely held that subsection 2-1402.21(a)(4) applies to actions by District agencies, including actions not specifically mentioned in the Act's definition of "real estate transactions." *See George Washington Univ. v. D.C. Bd. of Zoning Adjustment*, 831 A.2d 921, 939-40 (D.C. 2003). The District relies on *Hessey v. Burden*, 615 A.2d 562 (D.C. 1992), which found the DCHRA inapplicable to an initiative involving tax assessment procedures, *id.* at 579-80. As the tenants point out, however, in sharp contrast to the housing code enforcement decisions at issue here, the tax procedures challenged in *Hessey* bore no relationship at all to housing discrimination.

The tenants next challenge the district court's ruling that their claim is precluded by one of the DCHRA's exceptions, which states that "[n]othing contained in the provisions of this chapter shall be deemed to permit any rental or occupancy otherwise prohibited by any statute, or by any regulation previously enacted and not repealed herein." D.C. Code § 2-1402.24(b). The district court presumably found this exception

applicable because the housing and fire codes are regulations that allegedly prohibit "occupancy" of the tenants' apartment buildings. But none of the relief the tenants requested involved continued occupancy in buildings deemed uninhabitable by the District. The complaint and trial record make clear that the tenants never sought to live in buildings with code violations; instead, they wanted the District to remedy the violations either by using 5-513 funds or by pursuing the buildings' owners.

Finally, the tenants challenge the district court's conclusion that a separate DCHRA instruction was unnecessary because their DCHRA claim was "indistinguishable" from their Fair Housing Act claim. As the tenants point out, the DCHRA prohibits "place of residence" discrimination, *see* D.C. Code § 2-1402.21(a), which, in contrast to national origin discrimination, requires no evidence regarding the Hispanic population of the tenants' buildings. Defending the district court's conclusion, the city argues that because "the thrust of [the tenants'] complaint is that the District's enforcement actions were concentrated [in disproportionately Hispanic neighborhoods]," their place of residence claims are "completely dependent" on their national origin claims. District's Reply Br. 50. Again, the tenants have the better argument. A reasonable jury could conclude that even if the tenants provided insufficient evidence of national origin discrimination, they demonstrated that the District targeted buildings in Columbia Heights, thus discriminating against the tenants based on their place of residence. The tenants' DCHRA and FHA claims are thus sufficiently distinct to require separate instructions.

## IV.

This brings us finally to the cross-appeal of Andrew Serafin, owner of 1458 Columbia Road at the time of the challenged actions. Although the tenants initially named Serafin as a defendant, they later voluntarily dismissed their claims against

him.  The District cross-claimed against Serafin and the other building owners, asserting that if the tenants prevailed against the District, the city was "entitled to judgment and/or contribution" from the building owners because "their failure to abate the housing code violations caused the District to take enforcement action that may have led to Plaintiffs' alleged damages."  District's Answer to Second Am. Compl. 11.  The district court denied Serafin's motion to dismiss the District's cross-claim, but agreed to sever it from the rest of the case.

Although Serafin's brief is far from clear, he seems to argue that in ruling on his "Motion to Strike or Dismiss Crossclaim of District of Columbia," Serafin's Br. 1, the district court erred in declining to dismiss not only the District's claim against him, but also the claims of the 1458 Columbia Road tenants against the District.  Serafin explains that in 2002 he entered into an agreement of sale with the Tenants Association of 1458 Columbia Road which required the Association to "cause to be dismissed with prejudice all civil actions and all regulatory proceedings against . . . Serafin."  *Id*. at 3-4.  Accordingly, he asserts, "the Columbia Road Association was obligated to release its claims against the District . . . in order to effect the release or the dismissal of the District['s] . . . crossclaim against Serafin."  *Id*. at 4.  From this, Serafin concludes that the district court should have dismissed the 1458 Columbia Road tenants' claims against the District, thereby mooting the District's claims against him.

Though Serafin's claim suffers from defects too numerous to recount here, we think it appropriate to give him precisely what he wants: de novo review of the district court's "construction of [the] contract provision."  *Id*. at 5; *see LTV Corp. v. Gulf States Steel, Inc.*, 969 F.3d 1050, 1055 (D.C. Cir. 1992) ("Interpretation of the plain language of a contract is a question of law subject to *de novo* review by this court.").

Contrary to Serafin's assertions, we see not a word in the contract that precludes either the tenants' claims against the District or the District's cross-claim against Serafin. The contract requires nothing more than that the Columbia Road tenants dismiss their claims against Serafin, which they did.

## V.

To sum up, although the tenants have failed to demonstrate that the Hot Properties Initiative had a disparate impact on Hispanics, they have presented sufficient evidence for a reasonable jury to conclude that the District (1) intentionally discriminated against them on the basis of national origin in violation of the FHA, and (2) discriminated against them on the basis of place of residence in violation of the DCHRA. We thus reverse and remand with instructions to the district court to grant judgment to the District on the tenants' FHA disparate impact claim and to conduct a new trial limited to the tenants' FHA disparate treatment and DCHRA "place of residence" discrimination claims. We affirm the district court's denial of Serafin's motion to dismiss.

*So ordered*.