
**FILED**

Apr 18 2017, 9:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Larry O. Wilder
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Richard R. Fox
Steven A. Gustafson
Fox Law Offices, LLC
New Albany, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Wanda Roberts, et al. | April 18, 2017 |
| *Appellants-Petitioners,* | Court of Appeals Case No. 10A01-1607-PL-1647 |
| v. | Appeal from the Clark Circuit Court |
| Anthony Henson, | The Honorable Andrew Adams, Judge |
| *Appellee-Respondent,* | Trial Court Cause No. 10C01-1303-PL-22 |

**Barnes, Judge.**

## Case Summary

Wanda and Ray Roberts, along with seventeen of their neighbors (collectively "the Appellants"), appeal the trial court's grant of summary judgment in favor of Anthony Henson and the denial of their motion for summary judgment. We reverse and remand.

## Issue

The restated issue before us is whether the trial court correctly concluded as a matter of law that a structure built by Henson in the Appellants' neighborhood did not violate the neighborhood's restrictive covenants.

## Facts

Since 1961, the Roberts have owned a home at 114 Altra Drive in Clarksville, in the Altra Subdivision neighborhood. Construction in the neighborhood is governed by restrictive covenants adopted and recorded in 1956. One of the covenants provides: "No lots shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single-family dwelling not to exceed one and one-half story in height and a private garage for not more than two cars." Appellants' App. p. 18. Another provision states: "No structure of a temporary character, trailer, basement, tent, shack, garage, barn, or other outbuilding shall be used on any lot at any time as a residence either temporarily or permanently." *Id.* at 19.

In November 2012, Henson purchased a lot next door to the Roberts at 112 Altra Drive; the lot was vacant after the previous residence on the lot burned down. Henson filed a residential building application with the Town of Clarksville to build a structure on the lot. The application stated that the structure would have two stories, with 1,760 square feet of living space and 3,200 square feet of garage space. Attached to the application were the following drawings of the proposed structure:





-40-



-43-

[5] Thus, it appears from the drawings that the structure would consist of a two-story living area connected to a four-bay garage. Engineering reports prepared for the structure described it as a "barn." *Id.* at 56. The Town of Clarksville granted a permit to Henson to build the proposed structure, but noted, "Research of the covenants for this neighborhood is highly recommended!" *Id.* at 59.

[6] On March 18, 2013, after Henson began construction of his structure, the Roberts filed a "Petition to Enforce Restrictive Covenants" and a petition for an emergency restraining order compelling Henson to cease construction. *Id.* at 14. The trial court did not hold a hearing on the restraining order request. Seventeen other residents of the neighborhood subsequently intervened in the suit against Henson as plaintiffs. Henson eventually completed and moved into his structure while this litigation was pending.

[7] On September 24, 2015, Henson filed a motion for summary judgment. Accompanying the motion was an affidavit from W. House Canter, a retired member of the State Home Inspector Board. In the affidavit, Canter stated, that Henson's "house is a single family dwelling with 1.5 stories," and that it had "a garage fit for two vehicles. This restriction is a use restriction." Appellee's App. p. 5. There is a grainy photograph of Henson's building attached to Canter's affidavit; it is not possible to discern much from the photograph other than it depicts two levels of windows above ground at the front. The affidavit also made the following observations about other houses in the neighborhood:

7.     At 114 Altra Drive, the house has been remodeled to turn the original garage into living space and a detached garage has been built into the rear of the property. There is also a storage building behind the property not contemplated by the covenants.

8.     At 116 Altra Drive, the house has an additional 2 car garage in addition to the original garage attached to the house.

9.     105 Altra Drive also has an additional detached 2 car garage in addition to the original garage attached to the house.

10.     119 Altra Drive also has an additional detached 2 car garage in addition to the original garage attached to the house.

11.     206 Altra Drive has been remodeled to turn the original garage into living space and a detached garage has been built into the rear of the property.

12.     124 Altra Drive has additional canopied parking for more than two cars.

[8]     *Id.* at 6. Henson also submitted an affidavit on his own behalf, stating in part:

14.     My home is not a barn. My home is my residence. The use of the term "pole barn" in my application for a building permit is a "construction" term and not a "use" term. I incorrectly identified the construction method in my application. My home is correctly identified as a "post-frame building". Regardless, the restrictions do not prohibit either of these construction methods.

15.     My home is a one and a half story home and not a two story home.

*Id.* at 22.

[9] On April 14, 2016, the Appellants responded to Henson's motion and filed their own motion for summary judgment. Submitted with the Appellants' motion was an affidavit from professional home and commercial builder Troy Briner. Briner opined that after viewing Henson's building in photographs and in person, "it is my expert opinion that the building constructed on 112 Altra Drive, Clarksville, Indiana is what it was purported to be when the applications were secured from the town of Clarksville" and "that the building constructed is a 40 foot by 100 foot Pole Barn as described in all of the legal documents filed with the town." App. p. 108.

[10] On June 23, 2016, the trial court denied the Appellants' motion for summary judgment and granted Henson's motion. The Appellants now appeal.

## Analysis

[11] When reviewing a grant of summary judgment, we must draw all reasonable inferences in favor of the non-moving party and affirm only "'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (quoting Ind. Trial Rule 56(C)). Careful scrutiny must be given to a grant of summary judgment to ensure that the losing party was not improperly denied its day in court. *Id.* "Indiana's distinctive summary judgment standard imposes a heavy factual burden on the movant to demonstrate the absence of any genuine issue of

material fact on at least one element of the claim." *Id.* In determining whether summary judgment was properly granted, we consider only the evidentiary matter the parties specifically designated to the trial court. *Sargent v. State*, 27 N.E.3d 729, 731 (Ind. 2015). "The fact that the parties have filed cross-motions for summary judgment does not alter our standard for review, as we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012).

[12] "A restrictive covenant is an express contract between grantor and grantee that restrains the grantee's use of land." *Harness v. Parkar*, 965 N.E.2d 756, 760 (Ind. Ct. App. 2012). Such covenants maintain or enhance the value of land by restraining or regulating groups of properties. *Id.* at 760-61. Covenants control many aspects of land use, including what may be built on the land, how the land may be used, and alienability of the land. *Id.* at 761. "Property owners who purchase their properties subject to such restrictions give up a certain degree of individual freedom in exchange for the protections from living in a community of reciprocal undertakings." *Villas W. II of Willowridge Homeowners Ass'n, Inc. v. McGlothin*, 885 N.E.2d 1274, 1279 (Ind. 2008). Such covenants "'are clothed with a very strong presumption of validity which arises from the fact that each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed.'" *Id.* (quoting *Hidden Harbour Estates, Inc. v. Basso*, 393 So.2d 637, 639 (Fla. Dist. Ct. App. 1981)).

[13] "Covenants are a form of express contract, and we apply the same rules of construction when a dispute arises as to the covenants' terms." *Harness*, 965

N.E.2d at 761.  When we must interpret restrictive covenants, they should be strictly construed, with any doubts resolved in favor of the free use of property and against restrictions.  *Id.*  The covenanting parties' intent should be determined from the language of the covenants and the situation of the parties when the covenant was made.  *Id.*  In addition, the covenants must be read in their entirety, and differing provisions should be harmonized so as not to render any terms ineffective or meaningless.  *Id.*  Unambiguous language in a restrictive covenant must be given its plain, usual, and ordinary meaning.  *Johnson v. Dawson*, 856 N.E.2d 769, 773 (Ind. Ct. App. 2006).  Although construction of written contracts, including restrictive covenants, ordinarily is a question of law for which summary judgment is particularly appropriate, "where the intent of the parties cannot be determined within the four corners of the document, a factual determination is necessary to give effect to the parties' reasonable expectations."  *Campbell v. Spade*, 617 N.E.2d 580, 584 (Ind. Ct. App. 1993).  "When summary judgment is granted based on the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that any contract ambiguity can be resolved without the aid of a factual determination."  *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840-41 (Ind. Ct. App. 2016), *trans. denied*.

## A.  *"Pole Barn"*

[14]   The first question raised by the parties is whether Henson's structure was a "barn" or "pole barn" that was barred by the restrictive covenant prohibiting any "structure of a temporary character, trailer, basement, tent, shack, garage,

*barn*, or other outbuilding [from being] used on any lot at any time as a residence either temporarily or permanently." Appellants' App. at 19 (emphasis added). The Appellants contend that Henson's own engineer called the structure a "barn" or "pole barn" in direct contravention of the covenants. Henson asserts that language merely described the construction method of the building, which otherwise is a normal residence and does not resemble the traditional concept of an agricultural "barn."

[15] With respect to the covenant's prohibition against using a "barn" as a residence, we believe it is ambiguous with respect to whether it would apply to a structure such as Henson's. On the one hand, the engineering documents do clearly refer to the structure as a "barn"; on the other, it does not resemble a "barn" in the colloquial sense. With respect to this ambiguity, however, we conclude it can be resolved without resort to extrinsic evidence.

[16] In attempting to interpret an ambiguous contractual provision, we may consult sources reflecting the ordinary meaning of its terms at the time the contract was executed. *See Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). We do not have ready access to a dictionary from 1956, when these covenants were written. Regardless, we doubt the common understanding of that word is one that has changed significantly over time. A standard dictionary definition of "barn" is: "1. A farm building used to store farm products and shelter livestock. 2. A large shed for the housing of vehicles. 3. A particularly large, typically bare building." AMERICAN HERITAGE COLLEGE DICTIONARY 111 (3rd ed. 2000). Clearly, Henson's structure is not a

"farm building." There is the possibility that it could qualify as a "large shed for the housing of vehicles," given that the plans indicate the garage area of the building was to take up approximately three-quarters of the space, or a "particularly large" or "bare" building.

[17] However, the covenant at issue states that it prohibits using a "barn, or other *outbuilding*" as a residence. An "outbuilding" is defined as, "A building separate from but associated with a main building." *Id.* at 969. Read as a whole and in favor of the free use of land, the covenant bars the residential use of a second building on a lot in addition to the main residence. It does not require a main residence to be of any particular method of construction or architectural style. Here, the challenged structure is not an "outbuilding" but is *the* main structure and only residence on the lot. We conclude, as a matter of law, the structure does not violate the restrictive covenant against barns or other outbuildings being used as a residence.

### B. "One-and-one-half Stories"

[18] Next, we address the assertion that Henson's structure violates the restrictive covenant prohibiting any building from exceeding "one and one-half story in height . . . ." Appellants' App. p. 18. The Appellants note that the building permit application expressly stated that the structure would be two stories tall, and Briner stated in his affidavit that the structure was built as described in the permit materials. Henson contends that the covenant's limitation of structures to "one and one-half story in height" is ambiguous and notes, in any event, that

both he and Canter described the building as being only one-and-one-half stories tall.

[19] Henson's claim of ambiguity is based largely on several cases he cites from other jurisdictions, which he asserts establish that a residential covenant height restriction of "one-and-one-half stories" is "ambiguous as a matter of law." Appellee's Br. p. 11. However, that is not quite a universal view of that particular covenant language; nor does it mean that covenant disappears and that Henson's structure could be any height he desired it to be.

[20] One of the cases relied on by Henson is *Hiner v. Hoffman*, 977 P.2d 878 (Haw. 1999). In that case, the Hawaii Supreme Court addressed a 1966 restrictive covenant prohibiting any dwelling of more than "two stories in height" and a house that was listed on permit applications as a three-story structure and constructed according to those specifications. The undisputed purpose of the covenant language was to limit the height of residences in the neighborhood to protect the view planes of other residents. By a 3-2 vote, the *Hiner* court held that, "[w]here, as here, the covenant utterly fails to provide any dimensions for the term 'story,' there is simply no way to know whether the Hoffmans' three-story structure exceeded 'two stories *in height*.'" *Hiner*, 977 P.2d at 881 (emphasis in original). The majority thus held that this covenant language was ambiguous and could not be enforced against the owners of the three-story structure. *Id.* at 882.

By contrast, the dissent in *Hiner* stated, "The phrase 'stories in height' is an ordinary, stock expression.'" *Hiner*, 977 P.2d at 886 (Nakayama & Ramil, JJ., dissenting). The dissent did not find "two stories in height" to be ambiguous, and that even if it was, it was clear that the three-story house violated the plain purpose and intent of the covenant. *Id.* at 888.

Cases from other jurisdictions take a variety of approaches to whether restrictive covenants limiting buildings to a certain number of stories are ambiguous, and if they are whether they are still enforceable. Some, like the majority in *Hiner*, view such restrictions as inherently ambiguous and unenforceable. *See Johnson v. Linton*, 491 S.W.2d 189, 196–97 (Tex. Civ. App. 1973) (holding covenant restricting limiting homes to "one and one-half (1-1/2) story in height" was ambiguous and unenforceable where there was conflicting testimony from several experts as to what the covenant meant); *Ludwig v. Chautauqua Shores Improvement Ass'n, Inc.*, 5 A.D.3d 1119, 1119, 774 N.Y.S.2d 240, 241 (N.Y. App. Div. 2004) (holding similar covenant ambiguous and unenforceable where proponents of covenant failed to present "clear and convincing proof with respect to what number of feet constitutes a 'story in height'").

By contrast, other courts either hold that such provisions are not ambiguous, or even if so, they may be enforced where there is extrinsic evidence presented regarding the meaning of the covenant and whether a particular structure violates it. *See Foster v. Nehls*, 551 P.2d 768, 770–71 (Wash. Ct. App. 1976) (holding covenant height restriction of one and one-half stories to be

ambiguous, but that homeowner violated it based on extrinsic evidence that intent of covenant was to prohibit any structure that substantially obstructed view enjoyed by other neighborhood residents and that home violated that intent); *King v. Kugler*, 17 Cal. Rptr. 504, 507 (Cal. Ct. App. 1961) (holding covenant barring homes more than "one story in height" was unambiguous and clearly violated by structure that had a garage and ceiling with a room with a floor and ceiling above the garage); *Dickstein v. Williams*, 571 P.2d 1169, 1171 (Nev. 1977) (holding structure violated covenant against buildings exceeding "one story from ground level," which was found to unambiguous, and there was conflicting evidence about whether structure violated the covenant); *Pool v. Denbeck*, 241 N.W.2d 503, 506 (Neb. 1976) (holding covenant limiting structures to two stories was unambiguous and clearly violated by two-and-one-half story residence).

[24] We concede that particularly with a description such as "one-and-one-half stories," it could be deemed ambiguous with respect to whether a particular structure exceeds that height. It is less clear than a limitation of one or two stories. We agree, however, with those courts that do not automatically negate a covenant such as this simply because it could be deemed ambiguous; rather, it makes interpretation of the covenant and whether a structure violates it a question of fact. There is a lack of evidence in the record currently as to the intent behind this ambiguous covenant provision. Henson, as successful summary judgment movant, was required to designate some evidence as to intent and that his structure did not violate that intent. He did not do so. What

evidence there is in the record is conflicting. Henson and his expert, Canter, both described the building as being one-and-one-half stories, in compliance with the covenant, while the building permit application describes it as a two-story structure and the Appellants' expert, Briner, stated that the building was constructed in accordance with the plans, meaning it was in fact two stories. The evidence on the meaning of the covenant and whether Henson violated is either missing or conflicting.

[25] We are aware of the principle that ambiguities in a restrictive covenant should be construed in favor of the free use of land. This may mean reasonable interpretations of a covenant should be made in favor of such use, but we do not believe it means the covenant is entirely negated or that it could never be violated. After all, one person's "free use" of property may negatively impact another person's "free use" of property if it is in violation of covenants drafted to enhance the value, use, and enjoyment of property by all residents of the neighborhood. The other residents are entitled to fair enforcement of covenants when possible. Summary judgment was premature on the question of whether Henson violated this covenant. We reverse the grant of summary judgment and remand for further proceedings to resolve factual issues on this point.

### C. "Two-Car Garage"

[26] The final issue is whether Henson's structure violated the covenant stating that a residence can only have "a private garage for not more than two cars." Appellants' App. p. 18. This court previously has held that a covenant providing that a residence could only have "a private garage for not more than

three cars" was unambiguous and limited total garage space on a lot to space for three cars, regardless of the number of structures it might allow. *Johnson v. Dawson*, 856 N.E.2d 769, 773-74 (Ind. Ct. App. 2006). The defendant's plan in that case to build a detached two-car garage in addition to an attached two-car garage clearly violated the covenant. *Id.* at 774. Here, although Canter stated in his affidavit that Henson's structure had "a garage *fit* for two vehicles," he described this as "a use restriction." Appellee's App. p. 5 (emphasis added). It is unclear what Canter meant by saying the structure was "fit" for two vehicles and that it was a "use restriction." It is clear and unambiguous that the covenant prohibits garage space for more than two cars, regardless of how the space is used. The plans for the building clearly seem to show a four-bay attached garage and again, Briner stated that the building was built according to plan. On appeal, Henson makes no attempt to argue that he did not in fact construct a four-car garage on his lot. Rather, he relies solely upon the doctrine of acquiescence to excuse his noncompliance with the covenant regarding garages. He directs us to his designated evidence purporting to show that multiple other residents in the neighborhood violated the two-car garage limit without repercussions.

[27]     "A party opposing equitable enforcement of a restrictive covenant may plead as a defense the opponent's acquiescence to similar violations." *Hrisomalos v. Smith*, 600 N.E.2d 1363, 1367–68 (Ind. Ct. App. 1992). When analyzing a defense of acquiescence, the focus is the effect of the alleged prior violations upon the ability of the proponent of the restriction to enjoy the benefits of the

covenant, compared to the potential abridgement of the proponent's enjoyment of the covenant's benefit caused by the violation sought to be enjoined. *Id.* at 1368. Three factors are particularly significant to this analysis:

> 1) the location of the objecting landowners relative to both the property upon which the nonconforming use is sought to be enjoined and the property upon which a nonconforming use has been allowed, 2) the similarity of the prior nonconforming use to the nonconforming use sought to be enjoined, and 3) the frequency of prior nonconforming uses.

*Id.* Whether the principle of acquiescence may be invoked "depends on the factual circumstances." *Ellis v. George Ryan Co., Inc.*, 424 N.E.2d 125, 127 (Ind. Ct. App. 1981). In other words, whether this defense applies "is a question of fact." *Sandy Point Improvement Co. v. Huber*, 613 P.2d 160, 162 (Wash. Ct. App. 1980).

[28] It appears to us that in determining whether to allow Henson to invoke the defense of acquiescence, a fact-finder must consider all of the evidence and apply it to the three-factor test listed in *Hrisomalos*. As with the height restriction, we believe it is premature to conclude as a matter of law that the Appellants necessarily acquiesced in Henson's construction of a four-car garage. A fact-finder must carefully consider evidence and argument as to the location of Henson's structure compared to the Appellants' lots and other alleged nonconforming uses, the similarity of the other alleged nonconforming uses, and their frequency. It does not strike this that this is a mathematical test that can be decided on summary judgment. For example, regarding similarity,

a fact-finder may find that a resident who has converted a previously-attached garage into living space and built a separate two-car garage has not substantially violated the covenant in the same way that building a four-car garage would, or the fact-finder may conclude the opposite. Suffice it to say, further evidentiary proceedings are necessary to resolve the applicability of this defense. We reverse summary judgment as to this issue and remand for further proceedings.

## Conclusion

[29] We reverse the grant of summary judgment in Henson's favor with respect to the covenant provisions regarding story height and two-car garages and remand for further proceedings with respect to those provisions. However, we agree that, as a matter of law, Henson's structure is not a "barn" or "pole barn" that is prohibited by the covenants.

[30] Reversed and remanded.

Kirsch, J., and Robb, J., concur.